TERMINAL CONSTRUCTION CORPORATION, A CORPORATION OF THE STATE OF NEW JERSEY, RESPONDENT, v. ATLANTIC COUNTY SEWERAGE AUTHORITY, A MUNICIPAL CORPORATION OF THE COUNTY OF ATLANTIC, APPELLANT.

Argued March 17, 1975—Decided June 12, 1975.

*Mr. Eugene Tighe* argued the cause for appellant (*Messrs. Cole, Koury, Cole and Tighe,* attorneys).

*Mr. Murray A. Laiks* argued the cause for respondent (*Messrs. Heller and Laiks,* attorneys; *Mr. Laiks* and *Mr. Robert V. Mairone,* of counsel; *Mr. Herbert R. Ezor,* on the brief).

The opinion of the court was delivered by

MOUNTAIN, J. This is an action seeking a declaratory judgment. The Atlantic County Sewerage Authority (Authority), after competitive bidding pursuant to the "Local Public Contracts Law," *N. J. S. A.* 40A:11–1 *et seq.,* awarded to Terminal Construction Corporation (Terminal) five contracts substantially providing, in the aggregate, for the construction of a waste water treatment plant. Terminal brought this suit challenging the validity of the action taken by the Authority on the ground that its awards were so made as to vary from material conditions contained in the bidding specifications. The trial court sustained plaintiff's challenge, holding the awards to be invalid. The Authority appealed and subsequently sought certification while the case was pending unheard before the Appellate Division. We granted certification, 67 *N. J.* 91 (1975), because of the substantial public interest in a speedy and definitive resolution of the disputed issue so that construction might go forward.

The awards that were made relate to a 90-million dollar regional sewerage system presently under construction in Atlantic County. The project is 75% federally funded and 15% state funded, with the balance to be raised by the sale of bonds. The federal government, as a condition of its par-

ticipation, demanded a right of prior approval with respect to each contractor who was to perform work on the project, in order to insure that each such contractor presented a satisfactory "compliance position" with the equal opportunity provisions contained in federal laws and regulations · applicable to contractors on federally assisted projects. Looking to this end, the federal government instructed the Authority to incorporate the following provision in its bidding specifications:

PRE-AWARD CONFERENCE: Application has been or may be made to the Federal Environmental Protection Agency of the Department of the Interior for financial assistance for the work proposed under this solicitation. The Department of the Interior, in implementation of Executive Order No. 11246 (Equal Employment Opportunity), of September 24, 1965, requires its constituent Agencies which provide financial assistance to construction, to conduct Equal Employment Opportunity Compliance Reviews prior to award.

Accordingly, the apparent low BIDDER under this solicitation should be prepared to attend a meeting that will be scheduled by the Federal Environmental Protection Agency after opening of bids, but before award, where he will be requested to specify what affirmative action he has taken or proposes to take to assure equal employment opportunity on the Project. Until a determination has been made by the Federal Environmental Protection Agency that a satisfactory compliance position exists on the part of the prospective CONTRACTOR, and the determination has been concurred in by the Department of the Interior, Office for Equal Opportunity, award of the Contract will not be authorized.

A pre-award conference to determine the lowest responsible BIDDER'S ability to fulfill the requirements of Executive Order No. 11246 is mandatory for all Contracts exceeding $1,000,000.

When the bids were opened, Terminal was found to be the low bidder on the five contracts. Its several bids totalled $37,880,000, a sum seven and a half million dollars less than the next lowest bidder. In a matter of days Terminal informed the Authority that it, the bidder, had made a six million dollar error in its cost estimates and that because of this serious discrepancy, Terminal sought to be relieved of its bid. While this Court has never considered whether a public bidder should be permitted to withdraw its bid upon

a proven claim of unilateral mistake made in good faith, or, if so, under what circumstances this should be permitted, at least two reported trial court decisions have afforded such relief. *Cataldo Constr. Co. v. County of Essex,* 110 *N. J. Super.* 414 (Ch. Div. 1970); *Conduit & Foundation Corp. v. City of Atlantic City,* 2 *N. J. Super.* 433 (Ch. Div. 1949). *See also* 10 *McQuillin, Municipal Corporations,* § 29.82 at 444–46 (3d ed. 1966). The Authority, however, was reluctant unilaterally to relieve the contractor from its bid. It suggested that a suit be instituted to consider the availability of this relief, but Terminal was concerned with the integrity of its bidding reputation and chose not to take that form of legal action.

Shortly thereafter Terminal filed this suit alleging that the attempt to award the contracts before the "mandatory" pre-award conference had been held, and before the federal agencies mentioned in the specifications had approved the contractor's "compliance position," amounted to a material variance from the bidding specifications and that accordingly the awards should be deemed invalid. Parenthetically it may be noted that subsequent to the commencement of this action the federal government did in fact approve Terminal's "compliance position." The Authority conceded that while prior federal approval, whether or not including attendance at the meeting, was a specified condition to the granting of the award, nevertheless this condition had been imposed for the benefit of the Authority, was essentially immaterial to the proposed contract, and hence could properly be waived. Thus the underlying issue for determination is whether or not the condition in the specifications requiring prior federal approval may be waived. We have concluded, as did the trial court, that it may not.

The problem that has really provoked the present controversy can be traced to the somewhat contradictory demands of, on the one hand, the federally imposed bidding specifications requiring prior approval of a contractor — a process which may well consume more than 30 days — and, on the

other hand, the provisions of *N. J. S. A.* 40A:11–24, which stipulate that an award shall be made within 30 days of the receipt of the bids. A contracting unit situated as was the Authority may find itself literally unable to comply with both of these requirements. It may be forced to make a choice, within the 30-day statutory period, either to award the contract to the lowest bidder, making the award conditional upon a later receipt of federal approval, or, within the same time interval, make an unconditional award in the hope that federal approval will be later forthcoming and that the absence of *prior* approval will be overlooked or considered legally of insufficient consequence to jeopardize the award.[1] Here the Authority chose the latter course and made an award to Terminal that, on its face at least, was unconditional. The award was made within the 30-day period but admittedly before having received federal approval.

Despite the apparently unconditional nature of the award, the Authority nevertheless refused to execute a written contract until federal approval was received; it also rather pointedly refrained from giving assurances to Terminal that the contracts had indeed been unconditionally awarded. The issue was brought to sharp focus when Terminal was instructed to be present at the "Pre-Award" conference mentioned in the portion of the specifications quoted above. Terminal refused to attend until it received a definite commitment that the awards were unconditional; as no such assurance was forthcoming, the corporation sent no representative to the meeting. This suit followed.

██ ██ Bidding statutes are for the benefit of the taxpayers and are construed as nearly as possible with sole ref-

---

[1] A third alternative would be to postpone altogether making the award until the receipt of federal approval, even though this meant that the award would not be forthcoming until after the 30-day statutory period had expired. This alternative has not been suggested by either party and in view of its clear repugnance to the demands of *N. J. S. A.* 40A:11–24 we do not encourage a resort to such a course of action.

erence to the public good. Their objects are to guard against favoritism, improvidence, extravagance and corruption; their aim is to secure for the public the benefits of unfettered competition. To achieve these purposes all bidding practices which are capable of being used to further corrupt ends or which are likely to affect adversely the bidding process are prohibited, and all awards made or contracts entered into where any such practice may have played a part, will be set aside. This is so even though it is evident that in fact there was no corruption or any actual adverse effect upon the bidding process. As Justice Francis observed in *Township of Hillside v. Sternin,* 25 *N. J.* 317, 326 (1957),

> In this field it is better to leave the door tightly closed than to permit it to be ajar, thus necessitating forevermore in such cases speculation as to whether or not it was purposely left that way.

So in *Waszen v. City of Atlantic City,* 1 *N. J.* 272 (1949), this Court struck down the award of a garbage contract where the specifications had been so drawn as to effectively eliminate all but one bidder, although there was no corrupt motive involved. The particular bidder had been favored simply because of the competent and efficient manner in which he had served the municipality in the past. Similarly in *James Petrozello Co., Inc. v. Township of Chatham,* 75 *N. J. Super.* 173 (App. Div. 1962), despite a positive finding of the municipality's good faith, the Appellate Division struck down the award of a garbage contract where the township withheld for its own later determination an estimate of future growth within the municipality during the life of the proposed contract, an estimate which had the capacity, under the formula employed, to establish who would be the lowest bidder. The court pointed out that had this estimate been made before soliciting bids, the opportunity for indulging favoritism would have been removed. That no favoritism had in fact been shown was held insufficient to sustain the award. *See also, Asbury Park Press, Inc. v. City of Asbury Park,* 23 *N. J.* 50 (1956).

■■ It is firmly established in New Jersey that material conditions contained in bidding specifications may not be waived. *Township of Hillside v. Sternin, supra,* 25 *N. J.* at 324; *Case v. Trenton,* 76 *N. J. L.* 696 (E. & A. 1909). This rule, however, does not apply to minor or inconsequential conditions. Public contracting units may resolve problems arising from such conditions in a sensible or practical way. Our courts have on a number of occasions considered whether particular conditions might or might not be waived. Hence, while the submission of security with a bid is material and may not be waived, *Hillside, supra,* the form in which that security is submitted may vary slightly from that set forth in the specifications, *P. Michelotti & Sons, Inc. v. Borough of Fair Lawn,* 56 *N. J. Super.* 199 (App. Div. 1959) (uncertified check which was later certified); *Township of River Vale v. R. J. Longo Constr. Co., Inc.,* 127 *N. J. Super.* 207 (Law Div. 1974) (bid bond in lieu of certified check); *Hornung v. Town of West New York,* 82 *N. J. L.* 266 (Sup. Ct. 1911) (cashier's check instead of certified check).[2] A small difference between the amount of security submitted and that specified has been deemed immaterial, *Township of Hanover v. International Fidelity Ins. Co.,* 122 *N. J. Super.* 544 (App. Div. 1973), as has the arrival of a bid two minutes late, *William M. Young & Co., Inc. v. West Orange Redevelopment Agency,* 125 *N. J. Super.* 440 (App. Div. 1973).

On the other hand conditions requiring detailed description of materials, *Case, supra,* or specific amounts of additions or decreases in price if alternate products are to be used, *Remsco Associates, Inc. v. Raritan Township Municipal Util. Authority,* 115 *N. J. Super.* 326, 333–34 (App. Div. 1971)

---

[2]Legislative codification of the rule announced in these cases appears in *L.* 1974, *c.* 189, now found in *N. J. S. A.* 40A:11–21. This provides that any security guarantee required to accompany a bid may, at the option of the bidder, be in the form of certified check, cashier's check or bid bond.

or the delivery of certificates demonstrating a present ability to perform, *Tufano v. Borough of Cliffside Park,* 110 *N. J. L.* 370 (Sup. Ct. 1933); *Albanese v. Machetto,* 7 *N. J. Super.* 188 (App. Div. 1950), have all been found to be so material as not to be the subject of waiver.

Essentially this distinction between conditions that may or may not be waived stems from a recognition that there are certain requirements often incorporated in bidding specifications which by their nature may be relinquished without there being any possible frustration of the policies underlying competitive bidding. In sharp contrast, advertised conditions whose waiver is capable of becoming a vehicle for corruption or favoritism, or capable of encouraging improvidence or extravagance, or likely to affect the amount of any bid or to influence any potential bidder to refrain from bidding, or which are capable of affecting the ability of the contracting unit to make bid comparisons, are the kind of conditions which may not under any circumstances be waived.

Terminal has repeatedly stressed the importance of the "pre-award" conference. The conference appears to be a useful mechanism for the federal government to employ in pursuing its policy of eliminating the evil of racial discrimination in the building trades. At such a meeting contractors are given an explanation of the procedures they must follow so that the federal government will be able to monitor their performance, and they are also told in a general way what will be expected of them in their hiring policies. While such a meeting is doubtless useful, we fail to see how its waiver by a contracting unit, with the acquiescence of federal authorities, could be used to further a corrupt end or how such a waiver could adversely affect the bidding process. Every contractor was aware that by bidding he agreed to comply with federal rules and regulations. The proposed meeting seems to have been chiefly for his benefit to aid him in so complying. The evidence indicates that attendance at this meeting by experienced contractors is sometimes waived by the federal agencies. We conclude that the condition of the

bidding specifications requiring attendance by the presumptively successful bidder at a pre-award conference was a condition that could be waived in circumstances such as were here presented.

The materiality of the condition of prior federal approval of a contractor's "compliance position" is a quite different matter. The purpose of this condition is not merely to make certain that contractors formulate affirmative action plans to insure the hiring of workers representing minority groups, it is also to guarantee that the affirmative action plan conforms to the interpretation the agency is giving the applicable federal laws and regulations. The release of federal funds is directly dependent upon compliance with it.

Affirmative action may be expensive. The level of such action required on any given project is a factor which will almost surely affect the amounts of the individual bids and often will determine whether a contractor will be able to bid at all. *Weiner v. Cuyahoga Community College Dist.,* 19 *Ohio St.* 2d 35, 249 *N. E.* 2d 907 (1969) is a case providing an example of a contractor who was effectively prevented from successful bidding by affirmative action specifications. There, faced with a federal requirement similar to the one involved here, the contracting unit found it impossible to accept the lowest bid tendered because the federal government refused to approve the affirmative action plan of a contractor whose exclusive hiring hall contract with a local union would probably prevent him from employing a sufficient number of minority workers. The materiality of this condition we are considering is not in doubt; it follows that it was improper that it be waived and for this reason the awards were properly set aside by the trial court.

We return to the problem noted earlier in this opinion which arises when a contracting unit finds it impossible to meet all federal requirements within the time span allotted by state law. As we pointed out, securing federal approval of a proposed contractor's "compliance position" with respect to federal hiring policies may often take longer than the 30-day

period fixed by *N. J. S. A.* 40A:11–24. It is a fact of which we can readily take judicial notice that a great many building and construction projects are today financed in large part by federal funds. In order that this money may be readily forthcoming, it is extremely important that no obstacles be erected in the form of state laws or regulations that will unnecessarily impede the financial flow.

The Legislature is aware of this need, and in at least one related area has taken responsive action. *L.* 1974 *c.* 189, which, as mentioned above, is now found in *N. J. S. A.* 40A: 11–21, provides, *inter alia,* that a person bidding on a public contract may be required to tender with his bid a guarantee of 10% thereof, but not to exceed $20,000. The guarantee is intended to insure that if awarded the contract the bidder will in fact enter into the agreement and furnish any performance bond or other security that may be required. The act concludes with these words:

> In the event that any law or regulation of the United States imposes any condition upon the awarding of a monetary grant to any contracting unit, which condition requires the depositing of a guarantee in an amount other than 10% of the bid or in excess of $20,000.00 the provisions of this section shall not apply and the requirements of the law or regulation of the United States shall govern. [*N. J. S. A.* 40A:11–21]

We read this provision as having a twofold significance: first, it lays down the law with respect to the particular problem under immediate scrutiny. In the second place it may rightly be regarded as announcing a legislative judgment upon a broader issue, *i. e.,* to what extent should state regulatory law be molded to synchronize with such requirements as need be met in order to secure federal funds for local purposes.

The enactment which has posed the problem in the case before us, *N. J. S. A.* 40A:11–24, directs that a public contract shall be awarded within 30 days after bids have been received. It contains no dispensation in the event of there being a conflicting or contradictory federal regulation, or

if, as was here the case, compliance with a federal requirement cannot, or may not, be achieved within the prescribed interval. Yet we think the legislative judgment discernible in the statute last above quoted — that state regulation be interpreted, as far as possible, to harmonize with any federal requirement — should guide our hand in construing the 30-day statute as well.

We recognize this as a resort to a concept commonly known as the doctrine of the equity of the statute.

> It is a well known fact about the use of language that people sometimes speak with illustrative particularity when their object is to communicate a general principle or idea. When a court believes this to have happened in a legislative text it will implement the general principle by applying the statutory rule to situations other than those particularly mentioned in the statute where there is no basis in reason or policy for distinguishing between those situations and ones which are particularly mentioned. In such a case it is said that the decision is premised on what is deemed to be the equity or the spirit of the statute, as distinguished from its strictly "literal" meaning. [2A *Sutherland, Statutory Construction* 351 (4th ed. C. D. Sands 1973)]

In his classical essay, "Statutes and the Sources of Law," in *Harv. Leg. Essays* 213 (1934), republished in 2 *Harv. J. Legis.* 7 (1965), James Landis recounted the early origins and later history of the doctrine of the equity of the statute. He called attention to what he described as "the revolutionizing idea" set forth by Plowden, that "when the Words of a Statute enact one Thing, they enact all other Things which are in a like Degree." *Eyston v. Studd,* 2 *Plowden* 459, 467, 75 *Eng. Reps.* 688, 698 (1573). He went on to propound an eloquent plea for the greater use of legislative materials by courts engaged in the making of law.

In accordance with what has been said, we find there to have been a general legislative judgment that state regulation of bidding practices with respect to public contracts should, to the greatest extent possible, be harmonized with federal rules in those instances where an area of apparent conflict emerges. Bearing this in mind, it is our view that

where compliance with a federal requirement cannot reasonably be had within the 30-day period fixed by *N. J. S. A.* 40A:11–24, the contracting unit should nonetheless, within that period, make its award, specifying clearly that it is conditioned upon a later grant of federal approval. The bidding specifications should be carefully drawn to provide for this contingency. Such a procedure would avoid any dilution of our strong policy against the waiver of material conditions, it would accommodate federal requirements, it would appear to eliminate all likelihood that a state regulation would impede any hoped for influx of federal funds, and it would conform to what we believe to be sound legislative judgment.

For the foregoing reasons the judgment of the Law Division, Superior Court is hereby affirmed.

*For affirmance*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, and SCHREIBER and Judge CONFORD—7.