690 A.2d 1094

PENPAC, INC., AND RAYMOND J. BARBIERE, INDIVIDUALLY, PLAINTIFFS–RESPONDENTS, v. MORRIS COUNTY MUNICI-PAL UTILITIES AUTHORITY AND MORRIS COUNTY TRANS-FER STATION, INC., DEFENDANTS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued February 25, 1997—Decided April 2, 1997.

Before Judges MUIR, Jr., KLEINER and COBURN.

*Joseph J. Maraziti, Jr.,* argued the cause for appellant Morris County Municipal Utilities Authority (*Maraziti, Falcon & Healey,*

attorneys; *Mr. Maraziti*, of counsel; *Leah C. Healey* and *Todd L. Normane*, on the brief).

*Louis R. Moffa, Jr.*, argued the cause for appellant Morris County Transfer Station, Inc. (*Schnader Harrison Segal & Lewis*, attorneys; *Mr. Moffa*, of counsel; *Edward J. McBride, Jr.*, on the brief).

*Robert J. Beacham* argued the cause for respondents.

The opinion of the court was delivered by

MUIR, Jr., J.A.D.

These consolidated appeals deal with the competitive bidding process set out in the Local Public Contracts Law, *N.J.S.A.* 40A:11-3, –4. We are required to review (1) the propriety of the Morris County Municipal Utilities Authority's (the Authority) acceptance of an offer to extend a contract for one year beyond its authorized term after it rejected bids for a new contract to provide the services covered by that contract; and (2) the propriety of the Authority's rejection of all bids on grounds of excessive cost. The trial court ruled the extension invalid on the ground it contravened the public bidding law. The court also invalidated the bid rejection and ordered the Authority to award a contract to plaintiff PENPAC, Inc. We now affirm in part and reverse in part.

I.

In a September 21, 1993, agreement, the Authority acquired two transfer stations. In that contract, the Authority hired Morris County Transfer Station, Inc. (MCTS) to operate the transfer stations and to transfer waste. Under the 1993 agreement, MCTS received $30 per ton to operate the stations and $17 per ton to transfer the waste. The agreement provided for a one time adjustment in January 1996, which resulted in a total cost of $38.65 per ton. The 1993 agreement had a December 31, 1996, termination date but provided the Authority "in its sole discretion [was] entitled to extend, upon three (3) month's prior written

notice to MCTS, MCTS's obligations pursuant to [the agreement] for two (2) individual six (6) month terms at the rates, [payable] for the calendar year 1996. . . ." The Authority did not exercise the option in accord with the contract terms.

On June 24, 1996, while its agreement with MCTS was still in force, the Authority filed a verified petition with the Commissioner of the Department of Environmental Protection (DEP) seeking approval for a rate reduction in the tariff charged by the Authority for the disposal of solid waste at its transfer stations on an interim basis. That reduction was sought, according to the petition, in anticipation of the implementation of a new contract to be awarded through the public bidding process. The Authority stated it foresaw that a new contract would result in substantially reduced costs from the current contract "due to prevailing market conditions and the recent experience of other New Jersey counties and solid waste implementing agencies." The reduction was to be implemented immediately. On July 30, 1996, the DEP accepted the proposed tariff rates on an interim basis. Until the reduction was actually realized through a new contract, the reduced tariff rates were subsidized through Authority funds held for that purpose.

On September 23, 1996, the Authority advertised for bids in connection with the operation of the two transfer stations and for transportation of solid waste to designated disposal sites. Bids were requested based on a contract duration of three consecutive years beginning in 1997 and cancelable by the Authority "without penalty or cause." Alternatively, bids were sought for the same years but with a provision to include an option whereby the Authority could extend the contract for two individual years. All bids were to be submitted by November 25, 1996. At that time, they were to be publicly opened and read aloud. The Authority reserved the right to reject "any and all bids" and to waive any informality in the bids.

In response to the advertisement, bids were submitted by Geological Reclamation Operations and Waste Systems, Inc.

(GROWS), PENPAC, and MCTS. According to the Authority, the price per ton by all bidders for both operation of the transfer stations and transportation of solid waste was higher than projected. The bidding process for the affected years and their total costs, as represented by the Authority, are:

| BIDDER | 1997 | 1998 | 1999 | TOTAL ESTIMATED COST |
|--------|------|------|------|----------------------|
| GROWS | $33.74 | $34.22 | $34.71 | $25,667,500 |
| PENPAC | $34.46 | $35.48 | $36.54 | $26,620,000 |
| MCTS | $32.78 | $38.78 | $44.78 | $29,085,000 |

The Authority's pre-bid estimates were $24.60 per ton in 1997, $25.22 in 1998, and $25.85 in 1999, for a total cost of $18,917,500. Thus, the Authority found GROWS's bid exceeded their estimate by $6.7 million, or 36%, and PENPAC by $7.7 million, or 41%. The Authority adopted a resolution on December 11, 1996, rejecting all bids. The Authority based its rejection on its projection that prevailing market conditions should have produced significantly lower bids. While all bids were rejected, GROWS's bid was also rejected for bidder failure to demonstrate it possessed a current Certificate of Public Convenience and Necessity as required by *N.J.A.C.* 7:26H-1.6(c).

Prior to rejecting all bids but after all the bids were read publicly as scheduled, the Authority received a letter from MCTS. MCTS offered to extend the operating arrangement with the Authority as set forth in the 1993 agreement. There is no dispute the proposed extension offered did not conform with the 1993 agreement's option period allowed to the Authority. In its proposal, MCTS indicated that it would waive compliance with the three-month notification provision. It offered a reduced rate of $29.70 per ton for operation and transportation. Consequently, the rate not only undercut the bids submitted but also was at a figure lower than that of the 1993 agreement.

On December 11, 1996, when the Authority rejected all bids, it simultaneously, by resolution, extended the 1993 agreement with

MCTS as per the terms proposed by MCTS. In accepting MCTS' offer, the Authority noted:

Such a rate is lower than the rates submitted by all the bidders who submitted bids in response to the Notice Bidders dated September 23, 1996 and, based upon the amount of solid waste to be processed in 1997, represents a total annual savings to the customers of the [Authority] of approximately one million dollars compared to the lowest bid submitted.

On December 17, 1996, the Authority and MCTS executed the agreement.

PENPAC and one of its principals, Raymond Barbiere, filed the complaint in lieu of prerogative writs giving rise to this appeal. The complaint challenged the extension and the rejection of bids. The trial court ruled the extension contravened the underlying purposes of the public bidding law. It also concluded, with some reservation, that even though the Authority had a "plausible" "good faith" basis for rejecting all bids, the "fundamental distortion of the bidding statutes by MCTS ... had an incredibly strong capacity to skew and distort the whole judgment process on the part of the Authority" in its decision to reject all bids. Consequently, it ordered the Authority to award the contract to PENPAC.

Defendants, on an emergent basis, appealed the ensuing judgment and sought a stay. We granted the stay pending resolution of the appeal due to the public interest involved.

## II.

Defendants argue the trial court erred when it voided the contract extension. They rely on *Palamar Constr., Inc., v. Township of Pennsauken*, 196 *N.J.Super.* 241, 482 *A.*2d 174 (App.Div. 1983). We conclude that where, as here, an existing contract to provide services to a public agency has expired due to the failure of the agency to exercise an option on terms consonant with the contract, a subsequent extension of the contract containing a change in its material terms contravenes the purposes undergirding the public bidding law and is void. Defendants' reliance on *Palamar* is misplaced.

The purpose of public bidding laws is to provide the public with the " 'benefits of unfettered competition.' " *Meadowbrook Carting Co. v. Borough of Island Heights,* 138 *N.J.* 307, 313, 650 *A.*2d 748 (1994) (quoting *Terminal Constr. Corp. v. Atlantic Cty. Sewerage Auth.,* 67 *N.J.* 403, 410, 341 *A.*2d 327 (1975)). The goal is that through competitive bidding the public interest in achieving the most economic result will be best served. *Township of River Vale v. R.J. Longo Constr. Co.,* 127 *N.J.Super.* 207, 215, 316 *A.*2d 737 (Law Div.1974). "The statutes authorizing competitive bidding accomplish that purpose by promoting competition on an equal footing and guarding against 'favoritism, improvidence, extravagance and corruption.' " *Meadowbrook Carting Co., supra,* 138 *N.J.* at 313, 650 *A.*2d 748 (quoting *Township of Hillside v. Sternin,* 25 *N.J.* 317, 322, 136 *A.*2d 265 (1957)). All bidders must be equally situated in their competition for a public contract. *Ibid.* Since competitive bidding is for the benefit of the public, "any private agreement which tends to prevent or restrict competition, or any scheme which has the effect of promoting favoritism, circumvents the statute and is contrary to ... public policy...." *Hanna v. Board of Educ. of Wicomico,* 200 *Md.* 49, 87 *A.*2d 846, 849 (1952).

Here, the award had the effect not only of promoting favoritism but also of tilting the bidding field in favor of MCTS and against its competitors. It afforded MCTS, after vying with its competitors on new bids and losing, a right not contained in the 1993 agreement to extend that contract on materially new terms. The opportunity to privately negotiate an agreement violated the recited goals of the competitive bidding requirements of the statute. We consequently agree with the trial court that the extension of the 1993 contract is void.

The substantial change in material terms beyond the scope of the about-to-expire 1993 contract invoked by the contractor is what makes *Palamar* inapposite here. In *Palamar,* we sustained the municipality's imposition of a post-bid condition on a newly bid contract. There, the bids did not require construction supervision

and the municipality, with the new bidders' acquiescence, altered the terms of the award to require supervision. We concluded, because the imposed post-bid condition did not disadvantage the competitor bidders and at the same time was "more onerous" to the successful bidder, the purposes of the bidding laws were not undermined. *Palamar, supra,* 196 *N.J.Super.* at 251, 482 *A.*2d 174.

Here, the extension award was beyond the terms of the 1993 agreement and at a substantially lower price than called for by that agreement. Moreover, it was effectuated not at the instigation of the public agency but at the impetus of the contractor. So, the extension award not only disadvantaged the bidders by not allowing them the opportunity to submit similar proposals, but also materially changed the 1993 agreement in a manner far beyond the municipally invoked and significantly lesser change in *Palamar.* Under these circumstances, *Palamar* offers no support for overriding the trial court's voiding of the extension agreement. We note decisions of other jurisdictions lend support to our holding. *See City of Baltimore v. Bio Gro Sys.,* 300 *Md.* 248, 477 *A.*2d 783 (1984); *Browning-Ferris Indus. v. City of Oak Ridge,* 644 *S.W.*2d 400 (Tenn.App.1982); *Miller v. State,* 73 *Wash.*2d 790, 440 *P.*2d 840 (1968).

### III.

We now turn to the propriety of the trial court's invalidation of the bid rejection. A municipality has a well-recognized right to reject all bids received for a public contract. *See Bodies by Lembo, Inc. v. County of Middlesex,* 286 *N.J.Super.* 298, 307, 669 *A.*2d 254 (App.Div.1996); *Cardell, Inc. v. Township of Woodbridge,* 115 *N.J.Super.* 442, 450–51, 280 *A.*2d 203 (App.Div.1971), *certif. denied,* 60 *N.J.* 236, 287 *A.*2d 733 (1972); *George Harms Constr. Co. v. Borough of Lincoln Park,* 161 *N.J.Super.* 367, 379, 391 *A.*2d 960 (Law Div.1978); *see also N.J.S.A.* 40A:11–24(a) (specifying that a "contracting unit shall award the contract or reject all bids within such time as may be specified in the

invitation to bid"). This is especially so where, as here, the right is reserved in the bidding solicitation. *Princeton Disposal Serv. v. Township of N. Brunswick,* 154 *N.J.Super.* 488, 490, 381 *A.*2d 1220 (App.Div.1977), *certif. denied,* 75 *N.J.* 608, 384 *A.*2d 838 (1978); *A & D Constr., Inc. v. Vineland,* 175 *N.J.Super.* 401, 404, 418 *A.*2d 1319 (Law Div.1980). The right to reject promotes competitive bidding in that it "serves as a strong inducement to bidders to keep their bids as low as circumstances permit." *Cardell, supra,* 115 *N.J.Super.* at 450–51, 280 *A.*2d 203. The right is a "discretionary privilege" but one "not without limit." *Bodies by Lembo, supra,* 286 *N.J.Super.* at 308, 669 *A.*2d 254; *see also Marvec Constr. Corp. v. Township of Belleville,* 254 *N.J.Super.* 282, 288, 603 *A.*2d 184 (Law Div.1992) ("awarding authority has considerable discretion to reject all bids" but that discretion "is not unfettered").

The decision to reject all bids must not be "arbitrary or capricious and it must be free from fraud, collusion and bad faith." *Marvec Constr. Corp., supra,* 254 *N.J.Super.* at 288, 603 *A.*2d 184. It is sustainable where motivated by good faith without consideration of eliminating an "unfavored bidder." *Princeton Disposal Serv., supra,* 154 *N.J.Super.* at 490, 381 *A.*2d 1220. Moreover, where all "bids have already been opened and each bidder's competitive position has been exposed, rejection of all bids should only occur for cogent or compelling reasons." *Marvec Constr. Corp.,* 254 *N.J.Super.* at 288, 603 *A.*2d 184 (quoting Cushman & Doyle, *Construction Bidding Law* § 1.7 (1990)); *see also Bodies by Lembo, supra,* 286 *N.J.Super.* at 309, 669 *A.*2d 254.

In *Cardell,* we explained when a municipality may reject all bids. We stated:

> Suffice it to say that when a municipal governing body concludes in good faith that the purposes of the public bidding statute are being violated, it may reject all bids submitted and in its discretion order a readvertising of the contract. Furthermore, *should the lowest bid substantially exceed the municipality's cost estimate* or its appropriation for the job, or should circumstances arise which might cause the municipal governing body to abandon or substantially revise the project, then a total rejection of bids might well be required.
>
> [*Cardell, supra,* 115 *N.J.Super.* at 451, 280 *A.*2d 203 (emphasis added) ].

These principles must be considered in the context of a court's scope of review when assessing the validity of bid rejections. In *Palamar*, we defined that scope. We said:

> A reviewing court cannot overturn the decision of a municipal body unless it finds that the decision was arbitrary, capricious and unreasonable. "Even when doubt is entertained as to the wisdom of the action, or as to some part of it, there can be no judicial declaration of invalidity in the absence of clear abuse of discretion by the public agencies involved." It is not the function of a reviewing court to substitute its judgment for that of the municipality's governing body and it is bound by the record before the governing body.
>
> [*Palamar*, 196 *N.J.Super.* at 250, 482 *A.*2d 174 (citations omitted).]

The decision of the Authority is entitled to the same respect.

██ Applying all of the foregoing principles, we are satisfied from our review of the record that the trial court improvidently invalidated the Authority's rejection of all bids. The Authority concluded all the bids substantially exceeded the Authority's estimated bid. The trial court concluded the Authority acted in good faith when it rejected the bids for that reason. The credible evidence in the record supports that good faith finding. *Meshinsky v. Nichols Yacht Sales, Inc.*, 110 *N.J.* 464, 475, 541 *A.*2d 1063 (1988). However, we can find no similar evidence in the record to support the trial court's conclusion the rejection was a consequence of MCTS's offer or that it had "the strong capacity to skew and distort" the Authority's whole judgment process in rejecting the bids. Since there are no facts in the record from which to reasonably infer that the Authority was motivated by MCTS's conduct rather than by the bids substantially in excess of the Authority's estimate, and particularly in light of the good faith finding, we reject the trial court's conclusion the bids' rejection was improper. *See C. B. Snyder Realty v. BMW of N. Am.*, 233 *N.J.Super.* 65, 69, 558 *A.*2d 28 (App.Div.), *certif. denied*, 117 *N.J.* 165, 564 *A.*2d 883 (1989) (where the focus of the dispute on appeal is not on credibility but rather the alleged error in the trial court's evaluation of the underlying facts and the implications to be drawn therefrom, the appellate function broadens beyond the pale of the conventional credible evidence scope of review).

The trial court's determination on this issue amounted to a substitution of judgment in an instance where there was no abuse of discretion by the Authority. The court's finding of good faith establishes the predicate that the Authority acted properly and within the scope of its authority when it rejected all bids consonant with the reservation in the instructions to bidders.

█ There is no support in law for the premise that a bidder's unilateral, unsolicited conduct serves as a basis for invalidating a local agency's good faith exercise of its considerable discretion. Nor can there be. The bidding laws are all designed to obviate the promotion of any conduct that could lead to favoritism, improvidence, or corruption. By eradicating the Authority's good faith exercise of its discretion based upon the uncontrollable conduct of a bidder, the court vitiated that bidding law design. It took from the Authority its broad discretion to reject all bids exercised for the cogent and compelling reason that the bids substantially surpassed the Authority's cost estimate. The unilateral, improvidential, and uncontrollable conduct of MCTS did not, as a matter of law or fact, invalidate the Authority's good faith rejection of the bids. The Authority's rejection of the bids promulgated the public interest; it was not subject to invalidation in this instance.

### IV.

While the extension agreement is void, a condition of our invalidation is that MCTS provide the waste operation and transport services for the duration of the bidding process consonant with that agreement's terms. *See Meadowbrook Carting Co.,* *supra,* 138 *N.J.* at 326, 650 *A.*2d 748.

The Authority shall advertise for new bids to be received within 120 days. The performance of the new contract should begin promptly after the contract has been awarded. *See ibid.*

The judgment under appeal is affirmed in part and reversed in part.