**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0515-18T3

IN RE BID SOLICITATION
#18DPP00205, CENTRAL JERSEY
LANDSCAPING T0777 SNOW
PLOWING AND SPREADING
SERVICES PROTEST OF NOTICE
OF INTENT TO AWARD.

_____

Argued June 4, 2019 – Decided June 26, 2019

Before Judges Fisher, Suter and Enright.

On appeal from the New Jersey Department of the Treasury, Division of Purchase and Property, RFP No. 18DPP00205.

Richard Wayne Hunt argued the cause for appellant Central Jersey Landscaping, Inc. (Parker McCay, PA, attorneys; Richard Wayne Hunt and Ashley Hope Buono, on the brief).

Rebecca Pluckhorn, Deputy Attorney General, argued the cause for respondent Department of Treasury, Division of Purchase and Property (Gurbir S. Grewal, Attorney General, attorney; Beth L. Mitchell, Assistant Attorney General, of counsel; Rebecca Pluckhorn, on the brief).

PER CURIAM

Central Jersey Landscaping (CJL) appeals from two decisions made by the Department of Treasury, Division of Purchase and Property (the Division), initially rejecting CJL's bid for salt-spreading services and later denying CJL's request for a stay of that decision.  We affirm.

The record reveals that on January 30, 2018, the Division issued an online Bid Solicitation, also known as a Request for Proposal (RFP).  In its RFP, the Division sought bids from contractors experienced in snow plowing and salt-spreading services.  However, potential vendors could choose to limit their bids to either plowing or spreading services.  The Division specifically solicited bids for over three hundred "price lines," also known as "snow sections" for approximately 13,000 miles of federal, state and interstate roads under its jurisdiction.  Snow sections are fixed sections of the highway requiring snow plowing and salt spreading.  The Division intended to award each contract to the bidder with the lowest hourly rate.

The RFP informed bidders of the criteria the Division might use to evaluate proposals, including:  the firm's experience, which was to be detailed in a form known as "Attachment Two"; the vendor's equipment, which was to be detailed in a form known as "Attachment One"; and the vendor's hourly rate.  Regarding a vendor's level of experience, the RFP specifically required that

bidders show "at a minimum, two years' experience performing snow plowing or spreading services on public roadways." The proposal further advised vendors that the stated criteria "may be used to evaluate Quotes . . . received in response to this Bid Solicitation . . . . The evaluation criteria categories may be used to develop more detailed evaluation criteria to be used in the evaluation process." The RFP further instructed that bidding vendors "must furnish all information required by completing the forms accompanying the [RFP]." Additionally, vendors were cautioned that failure to submit the forms, which included Attachments One and Two, "will result in rejection of the Quote."

On March 16, 2018, CJL electronically submitted its bid for salt-spreading services on several price lines. The same day, the State publicly announced the names of one hundred and sixty-four firms who submitted quotes for the first round. After reviewing the bids, the State rejected at least thirty-two vendors for failure to conform to the mandatory administrative requirements for Quote submission. Eight vendors, including CJL, were deemed non-responsive because they failed to submit Attachment Two.

Just two days after learning of its rejection by the Division, CJL emailed the Division informally asking it to reconsider its decision. CJL advised it had

"been a vendor with the DOT for the past five years" and had interpreted a section of the RFP to apply only to snow removal vendors because the clause stated "The Vendor (Bidder) must furnish all information required by completing the forms accompanying this Bid Solicitation (RFP) for one (1) or more Snow Sections and offering optional graders and loaders."

On August 29, CJL formally asked the Division to either provide CJL an in-person hearing or reconsider its decision, again noting it had five years of experience on other State contracts. CJL completed and submitted Attachment Two with its protest. CJL argued it was not afforded the same flexibility as other vendors (who also had been deemed deficient) to cure deficiencies. CJL further complained the online bidding system had malfunctioned. Additionally, CJL contended Attachment Two only applied to vendors bidding on snow plowing contracts, whereas CJL limited its bids to salt-spreading contracts.

Without holding a hearing, the Division denied CJL's request for reconsideration on September 5, 2018. The Acting Director issued a twelve-page decision in which it found CJL's bid materially deviated from the bid requirements, that the Division could not consider experience which was not detailed in CJL's bid, that instructions on the bidder solicitation form were not

materially misleading and that no system issues impacted the bidding process when the bidding opened.

CJL filed a notice of appeal on October 3, 2018, and on the following day, it asked the Division to stay the award of the disputed salt-spreading contracts until the appeal was heard. The Acting Director denied CJL's request for a stay on October 16, 2018, whereupon CJL moved for emergent relief before us. We denied CJL's application and this appeal followed.

CJL raises the following arguments for our consideration:

POINT I

THE DIVISION'S DECISION TO REJECT [APPELLANT'S] BID WAS ARBITRARY, CAPRICIOUS, AND UNREASONABLE BECAUSE ATTACHMENT [TWO] WAS NOT A MATERIAL TERM OF THE SOLICITATION AND THEREFORE, THE DIVISION'S REJECTION SHOULD BE REVERSED.

POINT II

THE DIVISION'S PROCUREMENT METHOD AND AUTOMATIC REJECTION OF [APPELLANT'S] BID WAS IMPROPER, UNFAIR, AND DID NOT PROVIDE UNIFORMITY TO ALL BIDDERS. THUS, [APPELLANT'S] BID SHOULD BE REMANDED TO THE DIVISION FOR EVALUATION AND CONSIDERATION ON THE REMAINING CONTRACT YEARS.

Our role when reviewing administrative agency determinations is limited. In re Stallworth, 208 N.J. 182, 194 (2011). Courts can intervene only in rare instances when "an agency action is clearly inconsistent with its statutory mission or with other State policy." George Harms Constr. v. N.J. Tpk. Auth., 137 N.J. 8, 27 (1994). A reviewing court "may not substitute its own judgment for the agency's, even though the court might have reached a different result." Stallworth, 208 N.J. at 194 (citations omitted). Generally, a reviewing court "will not interfere with a Final Agency Determination which pertains to contract awards or rejecting a bid or bidders unless there is a finding of 'bad faith, corruption, fraud or gross abuse of discretion.'" In re Jasper Seating Co., Inc., 406 N.J. Super. 213, 222 (App. Div. 2009) (quoting Commercial Cleaning Corp. v. Sullivan, 47 N.J. 539, 549 (1966)).

An agency action is only reversed when it is "arbitrary, capricious, or unreasonable, or [] not supported by substantial credible evidence in the record as a whole." Stallworth, 208 N.J. at 194 (alteration in original) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980)). A challenger must prove an agency's action breached this standard. Bueno v. Bd. of Trs., 422 N.J. Super. 227, 234 (App. Div. 2011).

6

CJL initially contends Attachment Two was an immaterial requirement for its bid and therefore, a waivable defect. It also asserts the Division's final decision is incompatible with the two-part materiality test, noting Attachment Two was used in the evaluation process as a tiebreaker for certain price lines. We do not find these arguments persuasive.

"[T]he bidding statutes are [intended] to benefit the taxpayers and they 'are construed as nearly as possible with sole reference to the public good.'" In re Jasper, 406 N.J. Super. at 222 (quoting Terminal Constr. Corp. v. Atl. County Sewerage Auth., 67 N.J. 403, 409 (1975)). "Their objects are to guard against favoritism, improvidence, extravagance and corruption; their aim is to secure for the public the benefits of unfettered competition." Terminal Constr. Corp., 67 N.J. at 410. The statute governing the specifications, invitations and award of public contracts, N.J.S.A. 52:34-12, reflects that an award of a public contract: "shall be made with reasonable promptness . . . by written notice to that responsible bidder whose bid, conforming to the invitation for bids, will be most advantageous to the State, price and other factors considered." State v. Ernst & Young, L.L.P., 386 N.J. Super. 600, 618-19 (App. Div. 2006) (quoting N.J.S.A. 52:34-12(g)). "Any or all bids may be rejected when the State

Treasurer or the Director of the Division of Purchase and Property determines that it is in the public interest so to do." N.J.S.A. 52:34-12(a).

The Director of the Division is vested with the discretion to determine "which bid will be most advantageous to the State." Commercial Cleaning Corp. v. Sullivan, 47 N.J. at 548. Although the Director enjoys broad discretion, that discretion is not limitless. Barrick v. State Dept. of Treasury, Div. of Property, 218 N.J. 247, 258 (2014). For example, the Division is prohibited from awarding a contract to a proposal that materially deviates from RFP requirements. Id. at 259. In determining whether a deviation is material and not waivable, our Supreme Court articulated a two-prong test.

> [F]irst, whether the effect of a waiver would be to deprive the [contracting party] of its assurance that the contract will be entered into, performed and guaranteed according to its specified requirements, and second, whether [the defect] is of such a nature that its waiver would adversely affect competitive bidding by placing a bidder in a position of advantage over other bidders or by otherwise undermining the necessary common standard of competition.
>
> [Meadowbrook Carting Co. v. Borough of Island Heights, 138 N.J. 307, 315 (1994).]

We are satisfied the Division performed an appropriate Meadowbrook analysis and properly concluded the subject specification involving Attachment Two was a material, non-waivable condition.

As to the first prong of the Meadowbrook test, the Acting Director concluded that without Attachment Two, the Division could not be assured the spreading services would be done appropriately. There was nothing arbitrary or capricious in finding a deviation from disclosing CJL's level of experience deprived the State of its "assurance that the contract will be entered into, performed and guaranteed according to its specified requirements." Meadowbrook, 138 N.J. at 315. The Acting Director noted RFP section 3.2 specified that vendors must "[p]ossess, at minimum, two (2) years' experience performing snow plowing or spreading services on public roadways." Next, RFP section 4.4.3 advised bidders that Attachment Two was a necessary submittal and RFP section 6.7 confirmed that experience was a factor upon which awards would be made. Additionally, N.J.A.C. 17:12-2.2(a) states that in order for a bidder to be eligible for a contract award, its proposal must contain all attachments required by the RFP's terms. Since Attachment Two was the only bid form that covered a bidder's experience as required by the RFP, it meets the first prong of the materiality test.

Prong two of the Meadowbrook test also is satisfied, as waiver of CJL's completion of Attachment Two would have placed CJL in a position of unfair advantage over other bidders. In Meadowbrook, 138 N.J. at 311-12, a

government entity waived the requirement for a consent of surety on a garbage-removal contract for one of the bidders. Addressing the second prong of the materiality test, the Meadowbrook Court ruled this consent was non-waivable, in part, because the waiver gave the vendor an unfair advantage over other bidders. Id. at 322-23. The Court expressed concern that other bidders unable to meet the requirement for a consent of surety may have been dissuaded from bidding at all. Id. at 323. Likewise, had other vendors known the requirement was waivable, they may have entered bids and increased competition for the contract. Id. at 323-24. The Meadowbrook Court cautioned that providing a waiver for a defective bid "had the capacity to affect the fairness of the bidding process," even though it was evident there was no corruption or actual adverse effect on the process. Id. at 322-23. In voiding the bid, the Court recognized its decision might occasionally result in additional cost to the public, but found the integrity of the bidding process is paramount. Id. at 325.

Meadowbrook guides our analysis here. Had CJL been awarded a contract on its bids without furnishing Attachment Two, it would have enjoyed an unfair advantage over contractors who chose not to bid due to the requirements set forth in Attachment Two. Moreover, the possibility certainly exists that other contractors could have put forth a more advantageous bid than CJL if they knew,

10

in advance, the requirement of Attachment Two was waivable. Thus, we agree with the Acting Director that the second prong of Meadowbrook was satisfied here.

As our Supreme Court has observed:

> Deviations from material specifications risk transgressing the duty to avoid favoritism, corruption, and the like. Requiring adherence to material specifications maintains a level playing field for all bidders competing for a public contract. Thus, requirements that are material to an RFP are non-waivable; the winning bidder's proposal must comply with all material specifications.
>
> [Barrick, 218 N.J. at 259.]

Essentially, if a vendor's bid fails to satisfy an RFP requirement which is determined to be non-waivable, then "the inquiry is over because the bid is non-conforming and a non-conforming bid is no bid at all." In re On-Line Games Contract, 279 N.J. Super 566, 595 (App. Div. 1995).

CJL next argues Attachment Two was not material as it was not itemized or included on the Bidder's checklist - which was appended to the solicitation. Moreover, CJL argues against materiality, claiming the language of Attachment Two does not inquire about salt-spreading experience. We find no merit in these arguments.

The Procurement Program Checklist states it was created "as a guide to assist Vendors . . . in preparing a complete and responsive Quote . . . ." The checklist confirms "[i]t is the Vendor's . . . responsibility to ensure that all requirements of the Bid Solicitation . . . have been met." This warning appears in bold font at the top of the page with the word, "all," underlined. At the bottom of the checklist, the form also advises "[v]endors . . . must ensure that all requirements of the Bid Solicitation . . . have been met as the Bid Solicitation . . . language supersedes this advisory checklist in the event of an error or omission." In an effort to highlight this language, the words are in a slightly larger font than those on the rest of the form and the word, "supersedes," is underlined. These statements on the checklist, taken together with the mandatory language in other parts of the RFP, provided notice it was the bidder's responsibility to ensure all the required forms were submitted and that the checklist might not list all necessary paperwork. CJL's failure to heed the warnings outlined in the checklist does not make Attachment Two any less material.

As to CJL's argument that Attachment Two does not pertain to salt-spreading experience, we refer to question three on the form, which states: "[i]f you do not possess experience plowing public roadways, please document any

12

plowing or spreading experience you possess." Although the other questions predominately relate to snow plowing, question three clearly asks the vendor about its spreading experience. Additionally, the RFP defines a "snow section" as "[a] predetermined section of highway requiring snow plowing and/or spreading services." Thus, CJL's argument regarding the materiality of Attachment Two as to spreading experience is flawed.

We also find CJL's contention that Attachment Two was not material because the Division used the form as a "tiebreaker" in certain instances just as unavailing. As the State points out, Attachment Two was used in the evaluation process as a tiebreaker for certain price lines. A tie could surface if vendors submitted identical hourly rates. Such a situation would not make Attachment Two any less material.

CJL next complains it was unfairly treated by the Division because other vendors were allowed to go outside the "four corners" of their bids to cure their bid deficiencies. In its reply brief, CJL also posits the Division should have considered CJL's bid because CJL performed spreading work under previous State contracts. Additionally, CJL asserts Attachment One contained enough information about its experience to warrant further inquiry from the Division, and that it was a pre-qualified vendor that had previously provided its experience

13

to the Division. In essence, CJL suggests the Division improperly rejected its bid because it had enough information about CJL's experience from sources other than Attachment Two. We find these arguments misplaced.

As to its claims of disparate treatment, CJL points to the Division's Recommendation Report, which identified certain rejections that were ultimately rescinded. CJL notes one of the bidders had its bid originally rejected because it did not provide pricing information. However, that same bidder later contacted the hearing unit stating the pricing information was submitted with its bid. The Division soon discovered the correct documentation had been submitted, but the format was not compatible with the Division's computer software. Unlike CJL, this bidder submitted the required documentation with its bid and the Division did not have to go outside the four corners of the bid to find it.

The other three vendors initially found to be noncompliant had not submitted Ownership Disclosure forms.[1] However, the RFP provided:

> [a] current completed Ownership Disclosure Form must be received prior to or accompany the submitted Quote . . . . A Vendor's . . . failure to submit the completed and signed form with its Quote . . . will result in the

---

[1]  This form addresses N.J.S.A. 52:25-24.2, which requires a corporation, partnership, or limited liability company to disclose the names and addresses of all members or stockholders of the entity who own a ten percent or more share.

rejection of the Quote . . . <u>unless the Division has on file a signed and accurate Ownership Disclosure Form</u> dated and received no more than six (6) months prior to the . . . submission deadline for this procurement.

[Emphasis added.]

This language mirrors N.J.S.A. 52:25-24.2, which requires the disclosure to either accompany the bid or occur prior to the bid. Specifically, N.J.S.A. 52:25-24.2 states that "no corporation, partnership, or limited liability company shall be awarded a contract . . . unless prior to the receipt of the bid or accompanying the bid . . ." the vendor discloses the required information. Thus, the requisite disclosure of ownership, which was missing from three other vendors, could be submitted prior to their bids. On the other hand, CJL cites to no statutory authority, statute, precedent or any language in the RFP that permitted the Division to rely on CJL's previous record with the DOT to satisfy the experience criteria. In light of these facts, we are not persuaded other vendors were given preferential treatment over CJL to cure their bid deficiencies. Essentially, CJL was not similarly situated to the other vendors, as no avenue existed for the Division to look outside the four corners of CJL's bid and cure the deficiencies pertaining to CJL's prior experience. Our conclusion that CJL was not subjected to disparate treatment also is bolstered by the uncontroverted fact that seven other bidders who did not submit Attachment Two were deemed non-responsive

15

and were not awarded a contract while two other vendors who did submit Attachment Two were also rejected because they did not demonstrate they had the requisite experience.

Next, CJL's suggestion that the Division could have gleaned CJL's level of experience from its submission of other paperwork, such as its prequalification paperwork, is similarly unpersuasive. Although CJL submitted prequalification paperwork to the State, no statute or other authority permitted the Division to rely on information CJL had on file with the Division. As the State highlights, RFP section 6.7 made clear the experience component of the evaluation would be based on the information provided in Attachment Two and not information outside of a bidder's proposal.

As we are satisfied the Acting Director correctly determined Attachment Two was material to CJL's bid and that the Division fairly treated all bidders who either did not submit Attachment Two or failed to demonstrate the requisite experience during the bidding process, we discern no basis to disturb the Division's final agency decisions of September 5, 2018 and October 16, 2018. The remainder of CJL's arguments do no warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0515-18T3