235 N.J. Super. 372 (1988)
562 A.2d 807
THOMAS P. CARNEY, INC., AND MICHELE GIGLIO, PLAINTIFF-APPELLANT,
v.
CITY OF TRENTON, A MUNICIPAL CORPORATION, TRENTON WATER WORKS, AND FITZPATRICK & ASSOCIATES, INC., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 12, 1988.
Decided December 2, 1988.
*373 Before Judges LONG and KEEFE.
David J. Kenny, argued cause for appellant (Hartsough, Kenny & Innes, attorneys, David J. Kenny on the brief).
George T. Dougherty, City Attorney, argued cause for respondents, City of Trenton and Trenton Water Works.
*374 Ann F. Kiernan, argued cause for respondent, Fitzpatrick & Associates, Inc. (Jamieson, Moore, Peskin & Spicer, attorneys; Ann F. Kiernan, of counsel and on the brief).
Bruce P. Ogden, argued cause for amicus curiae, Mechanical Contractors Association of New Jersey, Inc. (Lindabury, McCormick & Estabrook, attorneys; Edward J. Frisch, of counsel; Bruce P. Ogden, on the brief).
KEEFE, J.A.D., temporarily assigned.
Two issues concerning the Local Public Contracts Law, N.J.S.A. 40A:11-1, et seq. are raised on this appeal. They are: 1) whether § 16 of the Local Public Contracts Law prohibits naming multiple subcontractors for each branch of work identified in the bid proposal without contracting with each of them after the contract is awarded; and 2) whether a local contracting unit can waive a condition of the bid proposal which provides that the bid price in written terms prevails over the bid price expressed numerically.
This case involves a contract awarded for the construction of the Trenton Water Works Distribution Center (Project). The Project owner, City of Trenton (City), is a municipal corporation of the State of New Jersey. Thus, the advertising, bidding and contracting for the Project are governed by the Local Public Contracts Law, N.J.S.A. 40A:11-1, et seq.. The Project specifications contained a Notice for Bids which provided that,
Bid Proposals will be received as a lump-sum bid including general construction; structural steel and miscellaneous metal; plumbing and drainage; heating, ventilating and air conditioning; electrical and landscaping work.
The bidding, therefore, was to be done on a "single-prime" basis in which the successful low bidder would contract to perform the entire work with the aid of subcontractors in the specialty trades. The Instructions to Bidders directed that the bid "proposal shall be submitted on the Form of Proposal furnished by the Architect properly filled out and duly executed" by the bidder. The Form of Bid Proposal stated:

*375 The General Contractor [e.g. bidder] must list the name of each Prime Sub-Contractor for each Trade noted below whos[e] price was included i[n] his Single Overall Bid Proposal. The Substitutions of Prime-Subcontractor working on this Project will not be permitted.
On February 22, 1988, the City accepted bids for the project. Plaintiff, Thomas P. Carney, Inc. (Carney) submitted a base bid of $5,097,441.00. Defendant, Fitzpatrick & Associates, Inc., (Fitzpatrick) submitted a base bid in written terms of $4,000,995.00 and in numerical figures of $4,995,000.00. Fitzpatrick's bid, even at the higher number, was the low bid while Carney's was the second lowest bid. The bid proposal contained a table listing the separate trades for which subcontractors could be used. The form completed by Fitzpatrick appeared as follows:

SUB-CONTRACTOR
 TRADE
Schlosser, Wolfer, Structural Steel and Miscellaneous
Steel Crafters Steel
J.A. Christman, E.F. Grant Plumbing and Drainage
Air Con[,] E.F. Grant Heating Ventilating and
 Air-Conditioning [HVAC]
Elec. Constr[,] KDL Elec Electrical

In each of the trade branches, Fitzpatrick named multiple subcontractors; three for the steel and two each for the remaining trades. In contrast, Carney's bid listed a single subcontractor for each of the four trades.
Following the subcontractor listing, the form of bid proposal then included five "Alternate Bids." These alternates required each bidder to bid a price for each of five items of additional or alternate work to be added to the base price bid if the City determined after the bidding to have any of the additional or alternate work done.
On April 7, 1988, the City accepted the base bid of Fitzpatrick at the figure of $4,995,000.00, together with alternates two, four and five, for a total bid of $5,350,000.00. The Carney bid *376 with the same alternates totaled $5,422,800.00, or $72,800.00 more.
Carney instituted this suit on April 11, 1988, challenging the award of the contract to Fitzpatrick. Subsequently, the complaint was amended to add Michele Giglio, a resident of the City, as an additional plaintiff. By consent order entered on April 13, 1988 to proceed in a summary manner, the City was enjoined from taking any "further action in connection with the execution of a contract with defendant Fitzpatrick and Associates, Inc. for the construction of Trenton Water Works Distribution Center." After argument on the adjourned return date, Judge Levy dismissed the complaint and denied Carney's motion for a stay pending appeal. Carney filed its notice of appeal and an emergent motion for a stay. That stay was denied by this court on May 16, 1988. By leave granted, the Mechanical Contractors Association of New Jersey appear amicus curiae. Due to the public nature of the issues involved, the appeal was accelerated.
In an affidavit filed with the trial court, John R. Fitzpatrick, president of Fitzpatrick and Associates, Inc., stated that in light of the alternates selected by the City, Fitzpatrick would use Steel Crafters, one of the three listed steel companies, "as [its] structural steel contractor, because that contractor submitted the lowest figures on the package selected by the City." As to the other trades, Fitzpatrick claimed that he listed two subcontractors each for the plumbing and HVAC work because one subcontractor (Grant), who would perform the bulk of the job, did not work on fuel tanks, and the other subcontractors (Christman and Air Con) would do the plumbing and HVAC needed for the fuel tanks. He said that the work concerning the electrical subcontract would be allocated between fuel tank work (Electric Construction) and the remainder (KDL Electric).
Carney submitted a certification by Dale H. Fera, the president of Steel Crafters. Fera certified that in quoting the steel *377 subcontract work to both Fitzpatrick and Carney, Steel Crafters quoted all of the steel work and did not quote any break-out prices "for various types of work or a portion of the ... work." Thomas Carney certified that in quoting the electrical work to Carney, KDL Electric did not exclude the fuel oil tanks, but rather quoted a price for all of the electrical work. The certifications of Fera and Carney were submitted to refute Fitzpatrick's claims that it computed its bid on the basis of base/alternate work break-out prices which were necessitated by reason of the base bid price plus alternates as proposed by the City.
Section 16 of the Local Public Contracts Law provides in relevant part:
There will be set forth in the bid the name or names of all subcontractors to whom the bidder will subcontract the furnishing of plumbing and gas fitting, and all kindred work, and of the steam and hot water heating and ventilating apparatus, steam power plants and kindred work, and electrical work, structural steel and ornamental iron work, each of which subcontractors shall be qualified in accordance with this act. The contracting unit shall require evidence of performance security to be submitted simultaneously with the list of the subcontractors. Evidence of performance security may be supplied by the bidder on behalf of himself and any or all subcontractors, or by each respective subcontractor or by any combination thereof which result in evidence of performance security equalling, but in no event exceeding, the total amount bid. N.J.S.A. 40A:11-16.
Relying on the wording of the statute and on Stano v. Soldo Construction Co., 187 N.J. Super. 524 (App.Div. 1983), Carney argues that Fitzpatrick was required to name the one subcontractor in each trade with whom Fitzpatrick would actually contract. Carney argues that, by naming numerous subcontractors in each trade, Fitzpatrick places itself in a position where it can return to the subcontractors named in the bid after the bid has been awarded and require them to compete against each other in order to actually obtain the trade subcontract. In contrast, Carney, who has named only one subcontractor in each trade, is compelled to contract with that subcontractor *378 since substitutes are not permitted either by statute or by the bid proposal. Carney complains that it has little if any bargaining power over its proposed subcontractors after it receives an award while Fitzpatrick may exert considerable pressure upon its subcontractors to compete against one another thereby reducing its subcontract costs without passing the benefit of the reduction on to the public. Carney claims that such post award bid-shopping is prohibited both by the words of the statute and the holding in Stano.
Amicus takes a somewhat different approach to the issue. With reference to Fitzpatrick's bid in this case, it argues:
The statute precludes the use of such bidding methods, unless the bid itself reasonably describes the bidder's proposals in this regard, with sufficient particularity that anyone reading it can determine the allocated portion of the work which each named subcontractor will perform for any given combination of base and alternate work.
Amicus argues that such a requirement imposed upon bidders would prevent bid-shopping if general contractors are given the flexibility of allocating work among multiple subcontractors within the same trade who may have particular expertise in one but not all aspects of the trade. It contends that "the statute must be construed in this manner, so that the subcontractors will know where they stand and be able to resist the attempts at bid-shopping and so that the public in turn will not be harmed by such bid-shopping."
The argument by amicus highlights the flaw in Carney's interpretation of the statute. The "one subcontractor to a trade" rule contended by Carney is simply not found in the text of the statute. If the drafters of the statute intended to prohibit general contractors from using multiple subcontractors in each trade, we assume more precise wording would have been used. It seems obvious that the use of multiple subcontractors within a trade may have a beneficial effect in cutting contract costs which ultimately enures to the benefit of the taxpayers. To construe the statute as Carney suggests, would *379 be to deprive the public of this possible benefit. The statute does not prohibit a bidder from contracting with more than one subcontractor in a trade nor do we interpret it to require that each subcontractor named actually receive a contract. The statute simply required Fitzpatrick to name the subcontractors with whom he "will" contract. The purpose of the word "will" in the statute is to prevent substitutions of unlisted subcontractors, not to guarantee that each listed subcontractor receive a contract.
Where, as in this case, the contracting authority requests bids for a base bid price plus alternates and reserves the right, subsequent to the award, to choose which alternates will be selected, the public interest may well be served by allowing the general contractor to obtain various prices from several subcontractors within a trade in order to obtain the best price considering all contingencies. The public bidding laws of this State were designed to obtain the best possible return for public money and are to be interpreted for the benefit of the public, not of bidders. P. Michelotti & Sons v. Fair Lawn, 56 N.J. Super. 199, 201-202 (App.Div. 1959) app. dism. 31 N.J. 556 (1960). To construe the statute as Carney suggests would be to give the words a meaning not clearly suggested on their face while at the same time depriving the public of the benefits stemming from multiple subcontractor bidding within the same trade.
We agree with Judge Levy that the Stano case does not compel a different result. In that case a general contractor named an unqualified plumbing and heating subcontractor in its bid. The general contractor was denied the contract since its subcontractor was not qualified as required by statute. The general contractor contended that it should be permitted to substitute a qualified plumbing and heating subcontractor in the place of the unqualified one. In that case we held that the clear wording of the statute prohibited the substitution of a qualified subcontractor who had not been named in the bid in *380 the place of an unqualified subcontractor who had been named in the bid. In dictum we said:
If a bidder were able to substitute unlisted subcontractors, he would wait until after being awarded the bid and negotiate for a lower price, the savings from which would accrue to him and not to the public. Thus, a strict interpretation of `all subcontractors to whom the bidder will subcontract' as those subcontractors whom the bidder will actually use is consistent with the manner in which the act has been interpreted. Id. [187 N.J. Super.] at 535.
It is this passage that both Carney and amicus use to argue that the statute in question has more than a pre-qualification function. We do not read the cited language so broadly. Our focus in Stano was on the general contractor's desire to resort to post award substitutions of unlisted subcontractors in the place of listed subcontractors. Here Fitzpatrick did not attempt to substitute any subcontractor for the subcontractors that were named in its bid and its list contained the names of the subcontractors he actually used. Obviously Fitzpatrick had input from each of the listed subcontractors in preparing his bid. Thus, he expected no savings from a cheap, unlisted subcontractor. That is all we addressed in Stano. We did not suggest either directly or obliquely that post award bid-shopping with listed subcontractors should be precluded. And indeed, even assuming that such a process was viewed as an evil, no evidence was offered from the other two steel subcontractors that it was engaged in by Fitzpatrick. Had there been such bid-shopping, we assume that Fera, the president of Steel Crafters, would have mentioned it in the certification he gave to Carney for the purpose of this litigation.
Applying Stano beyond the facts of that case would result in outlawing a form of bidding which is arguably beneficial to the public and is not clearly prohibited by the wording of the statute. Moreover, amicus' suggestion that, if such bidding practice is permitted, we require that bids naming multiple subcontractors in a trade also describe which portions of the work each subcontractor will perform implicates more than statutory interpretation. Such a resolution goes far beyond the words of the statute and, thus, our power. If the Legislature *381 perceives a need to either ban the use of multiple subcontractors within a given trade, or require that each subcontractor named receive a contract, or impose conditions on the use of such a bid, we are confident that it will enact the necessary legislation to amend the statute. "We should not assume the function of the Legislature and rewrite the law to include therein something which those charged with the legislative responsibility might have inserted if the matter had been called to their attention." (emphasis added). Twp. of Brick v. Spivak, 95 N.J. Super. 401, 406 (App.Div. 1967), affm'd 49 N.J. 400 (1967). See also, Hancock v. Board of Review, 46 N.J. Super. 418, 421 (App.Div. 1957).[1]
Finally, we agree with Judge Levy that the City did not abuse its discretion in waiving the condition that the written bid price would supersede the numerical bid price. Judge Levy correctly noted that no harm would come to the City or its taxpayers by accepting Fitzpatrick's bid over Carney's. Carney's bid was higher than Fitzpatrick's whether the latter was expressed in words or numbers. It was obvious that a Fitzpatrick employee had simply made an error in writing out the bid number by omitting the word "thousand." Moreover, the undisputed proofs at trial demonstrated that the Water Works superintendent and the Project architect believed that the project could not be constructed for the written bid price. In fact, the numerical bid price came in at a substantially lower figure than the City had anticipated. Under the circumstances we conclude that the error in the bid was not a material one and could be waived by the City.
The judgment appealed from is affirmed.
NOTES
[1] Although we hold that amicus' suggestion cannot be judicially engrafted on the statutory language we do not intend to imply that the local contracting unit cannot impose such requirements as a part of the bid specifications.