704 A.2d 1301

GAGLIOTI CONTRACTING, INC., PLAINTIFF–APPELLANT,
v. CITY OF HOBOKEN AND LA ROCCA, INC.,
DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Submitted October 27, 1997—Decided November 17, 1997.

Before Judges HAVEY, LANDAU and NEWMAN.

*Bloom Borenstein,* attorneys for appellant (*Abraham Borenstein,* of counsel; *Andrew Kent,* on the brief).

*Murray, Murray & Corrigan,* for respondent City of Hoboken (*Linda Sabat,* on the statement in lieu of brief).

*Peckar & Abramson,* attorneys for respondent La Rocca, Inc. (*Gerard J. Onorata,* on the brief).

The opinion of the court was delivered by

NEWMAN, J.A.D.

This action arises out of the award of a public contract by defendant City of Hoboken (Hoboken) to defendant La Rocca, Inc.

(LaRocca), the second lowest bidder, instead of to plaintiff Gaglioti Contracting, Inc. (Gaglioti), the lowest bidder. Hoboken bypassed Gaglioti because of Gaglioti's failure to submit the names of its subcontractors to be used on the job with its bid documents. Gaglioti appeals. We affirm.

The relevant facts are not in dispute. On August 15, 1996, Hoboken posted a Notice to Bidders soliciting bids for construction of the North Park project in Hoboken. The notice called for the submission of bids no later than October 24, 1996.

The project entailed (1) seawall repair, pier removal and replacement, (2) the creation of a public park, complete with a new soccer field and a waterfront pavilion, and (3) a new building. Originally, Hoboken divided the project into the above three components, allowing contractors to bid on one, two or all three segments at their option. Although the project was divided into three sections, the plans and specifications accompanying the notice to bidders were not. One set of plans and specifications existed for all three components of the project.

After Hoboken opened the bids, it at once recognized that its three-component method was too confusing, as each portion of each contractor's bid varied widely from one contractor to the next. Consequently, Hoboken determined to rebid the project without dividing the tasks. Hoboken's rebid package, including the plans and specifications, was the same as that for the original bid, except that it called for a "lump sum" bid, and it reduced the cash allowance for unforeseen additional work from $50,000 to $10,000. Rebids were due by December 2, 1996.

Hoboken opened the bids at 2:00 p.m. on December 2, 1996. The lowest bidder was Gaglioti, who submitted a bid in the amount of $2,364,800. Hoboken's engineer called Gaglioti the next morning at 9:30 and informed it that Hoboken would most likely reject its bid because Gaglioti had failed to include a list of subcontractors as required by *N.J.S.A.* 40A:11-16. At 10:07 a.m., Gaglioti faxed a hand-written list of subcontractors to the engineer, together with the following note:

Enclosed is a list of the subcontractors that you requested. Normally, there is a form in the Bidding Package Requirements for this purpose. Since you only informed us at 9:30 a.m. on 12–3–96 we are sending this list to you at 10:07 a.m. 12–3–96.

The next day, Hoboken's corporation counsel forwarded a letter to the mayor of Hoboken and the members of the city council, advising them that Gaglioti's failure to include a list of subcontractors with its bid as required by state law constrained Hoboken to reject Gaglioti's bid. Counsel was also of the opinion that Hoboken could not waive the bidding deficiency, even though it was to Hoboken's financial advantage to do so. That same evening, the city council passed a resolution adopting the recommendations of the corporation counsel and awarded the contract to La Rocca, who, with a bid of $2,393,347, was the second lowest bidder. La Rocca and Hoboken executed a construction contract pursuant to the bid on December 26, 1996.

On December 21, 1996, Gaglioti filed an action in lieu of prerogative writs with an order to show cause returnable on January 10, 1997. In its verified complaint, Gaglioti sought a judgment declaring it the lowest responsible bidder, rescinding any existing contract between Hoboken and La Rocca, and directing Hoboken to contract with Gaglioti for construction of the North Park project. Following argument, Judge Margulies entered final judgment on January 13, 1997 on behalf of Hoboken and La Rocca, stating that his decision was based essentially on Gaglioti's "non-compliance with the requirement of *N.J.S.A.* 40A:11–16 that the list of subcontractors be submitted *with* the bid—and that the requirement is material and nonwaivable [and] the statute is to be rigidly enforced." (emphasis in original).

I.

On appeal, Gaglioti argues that *N.J.S.A.* 40A:11–16 does not apply to the North Park project, and it was therefore not required to submit the subcontractors list at the time of its bid.

*N.J.S.A.* 40A:11–16, hereafter referred to as Section 16, requires that a list of subcontractors be submitted with each bid. That statute provides in pertinent part:

Separate plans for various types of work; bids; contracts

In the preparation of plans and specifications for the erection, alteration or repair of any public building by any contracting unit, when the entire cost of the work will exceed the amount set forth in, or the amount calculated by the Governor pursuant to, section 3 of P.L.1971, c. 198 (C. 40A:11–3), the architect, engineer or other person preparing the plans and specifications may prepare separate plans and specifications for

(1) The plumbing and gas fitting and all kindred work;

(2) Steam power plants, steam and hot water heating and ventilating apparatus and all kindred work;

(3) Electrical work;

(4) Structural steel and ornamental iron work; and

(5) All other work required for the completion of the project.

The contracting unit or its contracting agent shall advertise for and receive, in the manner provided by law, either (a) separate bids for each of said branches of work, or (b) bids for all the work and materials required to complete the building to be included in a single overall contract, or (c) both. *There will be set forth in the bid the name or names of all subcontractors to whom the bidder will subcontract the furnishing of plumbing and gas fitting, and all kindred work, and of the steam and hot water heating and ventilating apparatus, steam power plants and kindred work, and electrical work, structural steel and ornamental iron work, each of which subcontractors shall be qualified in accordance with this act.* The contracting unit shall require evidence of performance security to be submitted simultaneously with the list of the subcontractors. Evidence of performance security may be supplied by the bidder on behalf of himself and any or all subcontractors, or by each respective subcontractor, or by any combination thereof which results in evidence of performance security equalling, but in no event exceeding, the total amount bid.

[*N.J.S.A.* 40A:11–16 (emphasis added).]

■ Gaglioti asserts that it did not have to comply with Section 16 in its bid submission for two reasons. First, it contends that Section 16 does not govern the submission of all bids, but rather concerns only "the preparation of plans and specifications for the erection, alteration or repair of *any public building.*" Gaglioti argues that the North Park project is not a "public building" under Section 16. Second, Gaglioti maintains that Section 16 is not mandatory in application because it declares that whomever prepares the bid notice *may* prepare separate plans and specifications. If separate plans and specifications are not created, Gaglio-

ti argues, the following segment in Section 16 which requires a list of subcontractors is never even triggered and is therefore inapplicable. We address the arguments in the order raised.

The Local Public Contracts Law, of which Section 16 is a part, does not define the words "public building." Decisions which have interpreted Section 16, however, have construed the term broadly. For example, in *Thomas P. Carney, Inc. v. City of Trenton*, 235 *N.J.Super.* 372, 562 *A.*2d 807 (App.Div.1988), we applied Section 16 to bids submitted for the construction of a water works distribution center.

Moreover, *N.J.S.A.* 52:32-2, which concerns public contracts and contains an identical provision governing the submission of bids, including the requirement of a subcontractors list, defines public building as:

> any building, structure, *facility or complex* used by the general public, including, but not limited to, theaters, concert halls, auditoriums, museums, schools, libraries, *recreation facilities*, public transportation terminals and stations, factories, office buildings, business establishments, passenger vehicle service stations, shopping centers, hotels or motels, and public eating places, constructed by any State, county or municipal government agency or instrumentality or any private individual, partnership, association or corporation, with the following exceptions: one- to four-family private residences; warehouse storage areas; and all buildings classified as hazardous occupancies. As used herein, "hazardous occupancy" means the occupancy or use of a building or structure or any portion thereof that involves highly combustible, highly flammable, or explosive material, or which has inherent characteristics that constitute a special fire hazard.
>
> [*N.J.S.A.* 52:32-6a (emphasis added).]

The intent behind both *N.J.S.A.* 52:32-2 and 40A:11-16 is the same, that is, to insure equality in the bidding process. Thus, the definition of "public building" under *N.J.S.A.* 52:32-6a should be equally expansive in *N.J.S.A.* 40A:11-16, mandating a list of subcontractors not only for physical buildings, but also for works surrounding them.

In addition to reconstruction of a pier and the creation of a public park, no dispute exists that the North Park project involved the construction of a building. Even if the term "public building" were not defined broadly, Gaglioti still would have been required to provide a list of subcontractors for that aspect of the project, and it did not do so.

■ Gaglioti further argues that Section 16 is not mandatory in application. Gaglioti contends that, where the municipality chooses not to prepare separate plans and specifications and instead opts for a "lump sum" bid, the requirement in Section 16 that bid submissions include a list of subcontractors is never triggered. We disagree.

Section 16 and its requirement of a list of subcontractors deal specifically with "lump sum" bids. *See, e.g., Prismatic Dev. v. Somerset County,* 236 *N.J.Super.* 158, 159, 564 *A.*2d 1208 (App. Div.1989) (refusing to allow a bid submission for "a single overall contract" to name alternative specialty subcontractors), *certif. denied,* 118 *N.J.* 205, 570 *A.*2d 965 (1989), *overruled on other grounds by Meadowbrook Carting Co., Inc. v. Island Heights Borough,* 138 *N.J.* 307, 320, 650 *A.*2d 748 (1994); *Carney, supra,* 235 *N.J.Super.* at 374, 562 *A.*2d 807 (holding that a list of multiple subcontractors submitted for a "lump sum" bid satisfied Section 16); *Stano v. Soldo Constr. Co.,* 187 *N.J.Super.* 524, 529, 455 *A.*2d 541 (App.Div.1983) (concluding that subcontractors listed on a "lump sum" bid pursuant to Section 16, even if unqualified, may not be substituted). As the decisions indicate, Section 16 is to be read as a whole, requiring that a list of subcontractors be submitted with every bid, regardless of whether it has been divided or is a "lump sum" bid.

## II.

■ Gaglioti next argues that, even if this court does find that Section 16 requires a list of subcontractors in the instant case, Hoboken is estopped from refusing Gaglioti's bid, despite the defect. Citing Hoboken's reference to Article 5.2.1 of the AIA General Conditions in its Notice to Bidders, Gaglioti contends that Hoboken expressly invited the naming of subcontractors "as soon as practicable after the award of the Contract."

Hoboken's bidding documents and specifications for the North Park project consist of general instructions and forms on which to fill out a bid. Included as Section 0.14 is the following:

Bidders Referred to Laws

The attention of bidders is especially called to the provisions of State, Municipal and County ordinances, regulations and statutes, or any political subdivision thereof, affecting him or his employees or his work. *He shall obey and comply with all such laws, statutes, regulations, and ordinances while engaged in the prosecution of work on this Contract.* Safety regulations of the New Jersey Labor Board and the Federal OSHA shall be specifically complied with.

[Emphasis added.]

Not included in the bidding package, but referenced on the first page, are required standard AIA forms, one of which is Article 5.2.1, which provides in relevant part:

Unless otherwise stated in the Contract Documents or the bidding requirements, *the Contractor, as soon as practicable after the award of the Contract, shall furnish in writing to the Owner through the Architect the names of persons or entities* (including those who are to furnish materials or equipment fabricated to a special design) proposed for each principal portion of the Work.

[Emphasis added.]

Gaglioti's reliance upon Article 5.2.1 of the AIA General Conditions is misplaced. Those conditions were merely incorporated in the bid documents by reference, and not actually produced by the city. Article 5.2.1 is strictly informational, requiring the General Contractor to provide the Owner with the names of all subcontractors and materialmen that will be used on the project. The paragraph does not address the particular types of work which are covered by Section 16, such as plumbing and gas fittings, heating and ventilation, electrical work and structural steel. Most significantly, Article 5.2.1 is in direct contravention to Section 16, fostering an opportunity for bid shopping, an atmosphere ripe for corruption, and benefiting only the general contractor who receives the award and not the public entity.

Hoboken's bidding package also includes a list entitled "Mandatory Forms to Be Submitted With Bids," which states:

Each bidder is required to complete this check list of all mandatory items that are required for this bid. The absence of any of these mandatory forms from the sealed bid package will be sufficient for rejection of the entire bid.

The list contains twelve items, including forms required by statute, such as a consent of surety form and stockholder disclo-

sure form. Nowhere, however, does it mention that a list of subcontractors is to be provided with the bid. Gaglioti reasons that this omission estops Hoboken from requiring such a document after submission of the bids.

To support its argument, Gaglioti relies on *Passaic County Utilities Auth. v. DiBella Sanitation Service, Inc.,* 272 *N.J.Super.* 238, 639 *A.2d* 745 (App.Div.1994). There, solid waste haulers transported waste out of the county, in direct violation of the governing district solid waste management plan. They were issued summonses for their violation by the local utility authority. The haulers defended the summonses by arguing that they relied on a notice issued to all solid waste collectors/haulers and facility operators by the Deputy Director of the Division of Waste Management in the Department of Environmental Protection. This notice instructed the industry that solid waste could properly be transported out of the district so long as certain conditions were met. Accepting the haulers' argument, we concluded that the utility authority was estopped from enforcing the district waste management plan because of the notice by the DEP, which governed the local utility authority.

*DiBella* is distinguishable. There, we expressly found that the DEP authorization "does not contradict any express statutory provisions." *Id.* at 242, 639 *A.2d* 745. On the contrary, any action by Hoboken upon which Gaglioti relied in failing to submit a list of subcontractors was in direct contravention to Section 16, which expressly requires that a list of subcontractors be submitted with every bid. The bidding documents emphasized that the laws of New Jersey applied to the bid. To be sure, a state statute, as here, has precedence over a general document by the American Institute of Architects. We, therefore, reject Gaglioti's argument on this issue.

### III.

■ Gaglioti contends that, because it specified its subcontractors within minutes of being asked, the statutory requirement that

it provide a list of subcontractors with a bid should be waived. According to Gaglioti, this is especially true because it used the same subcontractors on the rebid as it used on the original bid, which it completed six weeks earlier.

The Local Public Contracts Law requires that municipalities and counties advertise for bids on public contracts that exceed a statutory threshold amount in order to benefit the public by promoting unfettered competition. *Meadowbrook, supra*, 138 *N.J.* at 313, 650 *A.*2d 748 (quoting *Terminal Constr. Corp. v. Atlantic County Sewerage Auth.*, 67 *N.J.* 403, 341 *A.*2d 327 (1975)). Publicly advertised contracts must be awarded to the lowest responsible bidder. *N.J.S.A.* 40A:11–6.1. This requirement means "that the contract must be awarded not simply to the lowest bidder, but rather to the lowest bidder that complies with the substantive and procedural requirements in the bid advertisements and specifications." *Meadowbrook, supra*, 138 *N.J.* at 313, 650 *A.*2d 748.

The requirement that a bidder submit a list of subcontractors with each bid prevents a general contractor from negotiating or renegotiating with subcontractors after it is awarded the contract. Governor Kean said it best when he conditionally vetoed Senate Bill No. 1029, later enacted as amended as *N.J.S.A.* 40A:11–16.

If a general contractor could wait to name subcontractors until after he has submitted his bid to the local unit of government, then the local unit of government would be unlikely to benefit from any bid shopping undertaken by the general contractor in securing the performance of subcontractors. The purpose of public bidding is to secure performance of high quality for the lowest possible price, and I believe that this objective is furthered by retention of the current statutory scheme whereby subcontractors must be named by general contractors at the time their bids are submitted.

[*Governor's Reconsideration and Recommendation Statement*, S. 1029—L.1987, c. 48.]

Notwithstanding, Gaglioti argues that it did not engage in any of the post-bid shopping or negotiating with subcontractors which Governor Kean had feared. Rather, Gaglioti contends that it selected its contractors six weeks before the bid, and simply submitted a list of those contractors a few minutes late. More-

over, it maintains that it timely cured any defect in its original bid proposal, and therefore should have been awarded the North Park project contract.

■ The Supreme Court has stressed that "[s]trict compliance [with the Local Public Contracts Law] is required, and a municipality generally is without discretion to accept a defective bid." *Meadowbrook, supra,* 138 *N.J.* at 314, 650 *A.*2d 748. As a result, all bids must comply with the statute's terms, and "any material departure invalidates a nonconforming bid as well as any contract based upon it." *Ibid.* The Court has also acknowledged, however, that "minor or inconsequential discrepancies and technical omissions can be the subject of waiver." *Ibid.*

In *Township of River Vale v. R.J. Longo Constr. Co.,* 127 *N.J.Super.* 207, 216, 316 *A.*2d 737 (Law Div.1974), Judge Pressler formulated a two-prong test to determine whether a specific noncompliance is material and, therefore, non-waivable:

first, whether the effect of a waiver would be to deprive the municipality of its assurance that the contract will be entered into, performed and guaranteed according to its specified requirements, and second, whether it is of such a nature that its waiver would adversely affect competitive bidding by placing a bidder in a position of advantage over other bidders or by otherwise undermining the necessary common standard of competition.

This test has been adopted by the Supreme Court. *See Meadowbrook, supra,* 138 *N.J.* at 315, 650 *A.*2d 748. In *Meadowbrook,* a general contractor submitted the lowest bid but failed to include a consent of surety as required by the bid specifications and by statute. Similar to Gaglioti, the contractor cured its defect by providing a consent of surety within four days of the bid opening. The town elected to waive the strict requirement that a consent of surety be submitted with a bid and adopted a resolution to award the contract to the contractor. The question before the Court was whether the municipality's waiver was proper.

The Supreme Court determined that the failure to include a consent of surety with a bid proposal was a material defect which could be "neither waived nor cured." *Id.* at 320, 650 *A.*2d 748. Concluding that the contractor gained a competitive advantage by

failing to provide the consent of surety with its bid, the Court reasoned that the requirement may have deterred others who would have bid, had they known that the condition would be waived. *Id.* at 323, 650 *A.*2d 748. The Court found that the contractor's omission "had the capacity to affect the unfairness of the bidding process. 'This is so even though it is evident that in fact there was no corruption or any actual adverse effect upon the bidding process.'" *Id.* at 322–23, 650 *A.*2d 748 (quoting *Terminal, supra,* 67 *N.J.* at 410, 341 *A.*2d 327).

Thus, Gaglioti's argument that it cured its defect is of no consequence. According to *Meadowbrook,* an opportunity for favoritism is created by the award of a contract to one who fails to submit a bid in full compliance with the bidding requirements. *Id.* at 324–25, 650 *A.*2d 748.

Gaglioti also argues that Hoboken's refusal to accept its bid resulted in an additional cost to the public, in that a higher price must now be paid for the North Park project. A similar argument was rejected by the Court in *Meadowbrook.* There, the Court recognized that the public may be occasionally harmed by failure to waive a bid requirement, but "the overriding interest in insuring the integrity of the bidding process is more important that the isolated savings at stake." *Id.* at 325, 650 *A.*2d 748. "If an exception were made," the Court continued, "its effect would be to encourage bidders not to provide consents of surety, a result contrary to the purpose of the Local Public Contracts Law." *Ibid.*

Failing to provide a subcontractors list, much like a consent of surety, provides the non-complying contractor with an added advantage over its competition. Significantly, Judge Pressler's two prong test does not question whether the waiver actually affected competitive bidding, or whether the bidder actually took advantage of its non-compliance. Rather, it looks to whether it "*would* adversely affect competitive bidding by *placing* a bidder in a position of advantage." *See River Vale, supra,* 127 *N.J.Super.* at 216, 316 *A.*2d 737 (emphases added). Here, Gaglioti submitted its bid at 2:00 p.m. on December 2, and was informed at that time

that it was the lowest bidder. It was not until 9:30 a.m. the next day that it was even notified that a subcontractors list was necessary, and it promptly faxed such a list to the township thirty-seven minutes later. Between the time that it originally submitted its bid and the time that it submitted its subcontractors list, however, over 19 hours had passed. Once informed it was low bidder, Gaglioti *could have*, although we accept its representation that it did not, then negotiated with its intended subcontractors for prices that would enable it to comply with its bid, or to earn a higher profit for itself. Violation of the subcontractor clause thus affords the bidder the opportunity to secure an unfair competitive advantage. Accordingly, post-bid submission of a subcontractors list, in violation of *N.J.S.A.* 40A:11–16, is a material and non-waivable irregularity.

Relying on *Palamar Constr., Inc. v. Township of Pennsauken*, 196 *N.J.Super.* 241, 482 *A*.2d 174 (App.Div.1983), Gaglioti contends that even material defects can be waived if timely cured. In *Palamar*, a contractor failed to submit a qualification statement with its bid for the construction of a clubhouse facility for the Pennsauken Country Club, although such a statement was required by the town's plans and specifications. After the bids were opened and the contractor realized its error, it cured its omission by sending a qualification statement one and one-half hours later. Applying the *River Vale* test, we determined that the failure to include the qualification statement, which was provided shortly thereafter, was a non-material and waivable defect. We commented:

> After the bids were opened at 2 p.m. on August 5, the Township personnel necessarily had to sit down at some time, but not necessarily in the first-two hours, and go over the contractors' qualification statements to determine if any of the eight bidders should be disqualified due to a deficiency in their statements. But the fact that defendant Taylor submitted his contractor's qualification statement one and one-half hours late in no way put him on a better footing than any of the other bidders or prejudiced the Township.
>
> [*Id.* at 257, 482 *A*.2d 174.]

*Palamar* is distinguishable. There, no changes could have occurred between the opening of the bids and the time that the

contractor actually produced a qualification statement. Either the contractor was qualified or it was not. In Gaglioti's case, however, renegotiation could have occurred between Gaglioti and one or more subcontractors. Regardless of whether Gaglioti actually took advantage of this opportunity, it is still a material defect, and its waiver would threaten the integrity of the policies behind the competitive bidding statutes.

Gaglioti urges this court to reconsider the trial court's holding, contending that the specific facts of its case warrant relaxation of Section 16. *See William M. Young & Co., Inc. v. West Orange Redev. Agency,* 125 *N.J.Super.* 440, 311 *A.*2d 390 (App.Div.1973). In *Young,* bids for an agency's award of a demolition contract were to be opened at 2:00 in the afternoon. Because of inclement weather, one of the contractors' representatives called and informed the agency that he was nearby and would arrive momentarily but probably after the deadline. After the representative had arrived, the agency opened the bids shortly after 2:02 p.m. In determining that this departure in the advertised time for opening bids was a non-material and waivable defect, we stressed that our decision was limited to the instant factual circumstances. *Id.* at 444, 311 *A.*2d 390.

The specific facts of this case do not merit a waiver of the requirement of a subcontractors list. Indeed, to allow such a waiver would place Gaglioti at an advantage over its competitors, in contravention of public bidding policy. We decline to do so.

In view of our disposition of the prior issues, we need not address LaRocca's argument, which was not raised below, that Gaglioti's action should be barred by the doctrine of laches.

The judgment is affirmed.