817 A.2d 1023

BENJAMIN R. HARVEY CO., INC., PLAINTIFF, v. BOARD OF EDUCATION OF SPRING LAKE HEIGHTS SCHOOL DISTRICT AND WALLACE BROS., INC. DEFENDANTS.

Superior Court of New Jersey
Law Division

November 21, 2002.

384

*Joseph J. Hocking*, for Plaintiff Hedinger & Lawless LLC.

*J. Peter Sokol*, for Defendant Board of Education of Spring Lake Heights School District, McOmber & McOmber.

*Gerard J. Onorata,* for Defendant Wallace Brothers, Inc., Peckar & Abramson PC.

LAWSON, A.J.S.C.

This matter comes before the Court on a return date of Plaintiff Benjamin R. Harvey Company, Inc.'s ("Harvey") Order to Show Cause why the Defendants Board of Education of Spring Lake Heights School District ("Board") and Wallace Brothers, Inc. ("Wallace") should not be prohibited from performing a contract awarded to Wallace on October 28, 2002. This Court granted temporary restraints prohibiting immediate performance of the contract on November 6, 2002, and set the matter for oral argument on November 19, 2002. The Court has reviewed the moving papers, entertained oral argument and accordingly makes the following findings of fact and conclusions of law pursuant to *R.* 1:7–4.

In August 2002, the Board solicited bids for a construction project involving additions and alterations to the Spring Lake Heights Elementary School ("the Project"). The Board invited bidders to submit a single bid for any or all of the seven "prime contracts", which included 1) General Work, 2) Structural Steel and Ornamental Iron Work, 3) Heating and Ventilating Systems and Equipment, 4) Electrical Work, 5) Plumbing and Gas Fitting Work, 6) Case Work Equipment, and 7) Kitchen Equipment. Relevant to the complaint filed herein, one of the supplementary conditions set forth at Section 5.2.5 mandates that bidders for any of the seven prime contracts perform a minimum of thirty-five percent of the work with their own forces. Section 5.2.5 then allows for a relaxation of this requirement by specifying a procedure whereby a written request must be submitted with the bid:

> A Contractor may request to have the percentage of work that has to be self-performed lowered. Such request must be in writing, submitted with the original Bid and must clearly delineate and specify exactly what work is to be self-performed and what work will be performed by subcontractors.

Section 5.2.5 also states that "[t]he Owner may at its sole and unfettered discretion reduce the required percentage. No reduction in the percentage will be approved by the Owner unless it is in the best interest of the Owner."

In order to verify compliance with Section 5.2.5, the bid documents also contained Bid Form Attachment # 5 ("Attachment # 5"), which required bidders to identify and allocate a dollar amount to each specific item of self-performed work. The bid documents also reserved to the Board discretionary power to waive any informalities in the bids, although bidders were advised that "under no circumstances will the Owner waive any informalities which would give one Bidder substantial advantage or benefit not enjoyed by all Bidders."

When bids opened on October 10, 2002, Harvey and Wallace submitted bids on the General Work contract. Wallace's bid of $3,537,960.00 was $192,040.00 lower than Harvey's bid of $3,730,000.00 The total value of work which Harvey identified as self-performed was $1,534,000.00, or forty-one percent of its total bid. Wallace, however, identified one hundred percent of its total bid as being self-performed. Harvey avers that Wallace's submission was non-responsive because Wallace could not, in fact, perform one hundred percent of the work.

Subsequent to the bid opening, on October 11, 2002, Harvey challenged Wallace's bid on the grounds that Wallace improperly completed Attachment # 5 and submitted conflicting prices for the Terrazzo tile work. Prior to the award of the contract, however, Wallace cured the irregularity in Attachment # 5 by submitting a revised document at the request of the project architect. After reviewing Harvey's claims and Wallace's bid submission, the project architect recommended on October 24, 2002 that Wallace's bid be accepted and that Wallace be awarded the general contracting portion of the Project. By way of a resolution dated October 28, 2002, the Board accepted the architect's recommendation and awarded the contract to Wallace.

Harvey now challenges the Board's award on grounds that Wallace submitted a materially deficient bid. Harvey maintains that it was the lowest responsive and responsible bidder and is therefore entitled to the award.

█ The purpose of competitive bidding for local public contracts is not protection of individual interests of bidders, but rather advancement of public interest in securing the most economical result by inviting competition in which all bidders are placed on equal basis. *See Township of River Vale v. R.J. Longo Construction Co.*, 127 *N.J.Super.* 207, 316 *A.2d* 737 (Law Div. 1974). Courts have consistently held that the purpose of the competitive bidding process is to secure the most economical result in the expenditure of public moneys by promoting uninhibited competition and guarding against "favoritism, improvidence, extravagance and corruption." *Township of Hillside v. Sternin*, 25 *N.J.* 317, 136 *A.2d* 265 (1957); *see also L. Pucillo & Sons, Inc. v. Mayor of New Milford*, 73 *N.J.* 349, 375 *A.2d* 602 (1977). Accordingly, statutes authorizing competitive bidding demand that publicly advertised contracts be awarded to the "lowest responsible bidder."

█ Although case law reveals that strict compliance with public-bidding guidelines is required, *see, e.g., Pucillo, supra*, at 349, 375 *A.2d* 602 ("[w]e are not, however, willing to transform the mandatory requirement in these specifications into a polite request."), competitive bidding provisions should not be construed in such a way as to thwart the primary purpose of achieving economy. *Tec Electric, Inc. v. Franklin Lakes Board of Education*, 284 *N.J.Super.* 480, 484, 665 *A.2d* 803 (Law Div.1995). As such, material conditions contained in bidding specifications may not be waived, while immaterial deficiencies may be waived. *See Meadowbrook Carting Co. v. Island Heights Borough*, 138 *N.J.* 307, 314, 650 *A.2d* 748 (1994)(holding that the inclusion of a consent of surety is a material condition precedent to a responsive bid). The Public School Contracts Law reflects this precedent, mandating:

Where there have been developments subsequent to the qualification and classification of a bidder which in the opinion of the board of education would affect the responsibility of the bidder, information to that effect shall forthwith be transmitted to the department for its review and reconsideration of the classification. Before taking final action on any such bid, the board of education concerned shall notify the bidder and give him an opportunity to present to the department any

additional information which might tend to substantiate the existing classification. [*N.J.S.A* 18A:18A–31.]

The question thus presents itself: Did Wallace's bid, pledging that it would perform one hundred percent of the work with its own forces, rise to the level of a material deficiency for which waiver may not be granted?

The distinction between conditions which may or may not be waived "stems from a recognition that there are certain requirements often incorporated in bidding specifications which by their nature may be relinquished without there being any possible frustration of the policies underlying competitive bidding." *Terminal Const. Corp. v. Atlantic County Sewerage Auth.*, 67 *N.J.* 403, 341 *A.*2d 327 (1975). The Supreme Court of New Jersey holds that advertised conditions:

> whose waiver is capable of becoming a vehicle for corruption or favoritism, or capable of encouraging improvidence or extravagance, or likely to affect the amount of any bid or to influence any potential bidder to refrain from bidding, or which are capable of affecting the ability of the contracting unit to make bid comparisons, are the kind of conditions which may not under any circumstances be waived. [*Id.* at 412, 341 *A.*2d 327].

In determining whether waiver of the Board's advertised conditions is capable of precipitating the effects cited in *Terminal*, the Court turns to the two prong test of materiality set forth in *Township of River Vale v. R.J. Longo Construction Co.*, 127 *N.J.Super.* 207, 215, 316 *A.*2d 737 (Law Div.1974):

> There must, therefore, be applied two criteria in determining whether a specific noncompliance constitutes a substantial and hence nonwaivable irregularity—first, whether the effect of a waiver would be to deprive the municipality of its assurance that the contract will be entered into, performed and guaranteed according to its specified requirements, and second, whether it is of such a nature that its waiver would adversely affect competitive bidding by placing a bidder in a position of advantage over other bidders or by otherwise undermining the necessary common standard of competition.

If both of these questions are answered in the negative, then the deficiency may be waived. With this precedent in mind, the Court must determine whether Wallace submitted a materially deficient bid.

A.  *Whether the effect of a waiver would be to deprive the municipality of its assurance that the contract will be entered into, performed and guaranteed according to its specified requirements*

██ The designated architect for the Project is Thomas Associates Architects & Engineers, P.C. ("Thomas"). Thomas certifies that its "sole concern" in employing the thirty-five percent requirement "is to prevent contractors from brokering the entire contract work...." Harvey represented in its bid that it would complete forty-one percent of the project work with its own forces. Wallace, on the other hand, pledged that it would complete one hundred percent of the project work with its own forces. In essence, Harvey argues that its submission is acceptable and Wallace's submission is not. Harvey defends its position by pointing out that Wallace cannot and will not perform one hundred percent of the general construction work. For example, the windows specified for the project must be supplied by EFCO, and Wallace is not a certified installer of EFCO windows. The manner in which Wallace completed Attachment # 5, according to Harvey, was the functional equivalent of either failing to submit the attachment altogether or submitting a completely blank form.

Wallace and the Board offer the counterargument that Section 5.2.5 requires the successful bidder to perform a *minimum* of thirty-five percent of the contract work with their own forces. Because the bid specifications specifically afford the Board the right to reduce this amount upon request, Wallace and the Board suggest that Wallace's incorrect submission of Attachment # 5 was a waivable, immaterial defect.

Harvey correctly cites to *L. Pucillo & Sons, Inc. v. Mayor and Council of Borough of New Milford,* 73 *N.J.* 349, 356, 375 *A.*2d 602 (1977) for the rule that a bidder is not free to disregard with impunity the bid requirements advertised by a public entity. This precedent, coupled with the bid documents' caveat that "[u]nder no circumstances will the Owner waive any informality that, by such waiver, would give one Bidder a substantial advantage or

benefit not enjoyed by all other Bidders," appears to bolster Harvey's conclusion that Wallace's failure to correctly fill out Attachment # 5 constituted a material, nonwaivable breach. Harvey does not, however, fully address the fact that the Board retained the right to waive any informalities in the bids. Moreover, according to the bid specifications, contractors held the option of submitting a written request that the Board lower the thirty-five percent requirement. In addition, the bid specifications also reserved to the Board the right to reduce the required percentage "at its sole and unfettered discretion." It is difficult to reconcile the argument that the thirty-five percent requirement was an immutable, material element when the bid specifications allowed the Board to reduce this percentage, either at its own discretion, or upon the written request of the bidder. A bid condition changeable after the bid opening can hardly be considered material where departure from its requirements are expressly permitted and provisions for doing so are communicated to the bidders.

Therefore, with respect to the first prong of the materiality test, the Court finds that Wallace's deficient filing of Application # 5 did not deprive the Board of assurance that the contract would be entered into and performed according to the specifications. Wallace's bid indicated that it would perform one hundred percent of the work, which technically satisfied the thirty-five percent requirement. Wallace does not deny that it misunderstood the intention of Attachment # 5 and essentially treated it as a schedule of values, providing a line-by-line breakdown of its bid. Knowing, however, that Wallace most likely misunderstood Attachment # 5, Thomas checked with Wallace, and Wallace submitted a revised form wherein it demonstrated compliance with the thirty-five percent requirement. This revised submittal merely confirmed that Wallace was performing in excess of the thirty-five percent requirement. Because the specifications did not prohibit the submission of a revised form, other bidders were free to do so as well. Any resubmittal of Attachment # 5 could not have changed the base bid amounts. Thomas and the Board thus

proceeded in a manner perfectly consistent with the curative principles established under *N.J.S.A.* 18A:18A–31.

  B.  *Whether the noncompliance is of such a nature that its waiver would adversely affect competitive bidding by placing a bidder in a position of advantage over other bidders or by otherwise undermining the necessary common standard of competition.*

  The second prong of the materiality test addresses the issue of whether Wallace undermined the competitive bidding process by incorrectly submitting Attachment # 5.  Although it is not unusual for a board of education to require a general contractor to perform a percentage of contract work with its own forces, such requirements are usually not commonplace.  In this case, however, the Board specifically required the successful bidder to perform thirty-five percent of the work through its own forces. The Board could reduce this number either in its own discretion or upon the bidder's written request.

  Harvey avers that by designating a specific percentage of the work to be self-performed, it "locked" itself into performing this work, and it did not thereafter have the option of performing that work through subcontractors.[1]  In support of its argument, Harvey refers to the certifications of two other bidders for the Project who likewise interpreted the specifications as "locking" themselves into the amount of worked pledged in the bids.  Thus, Harvey

---

[1] In its certification, the Boards Architect states:

Our sole concern in employing [the thirty-five percent provision] is to prevent contractors from brokering the entire contract work, so we have not been concerned with what categories of work the contractor chooses to do. Because this is the sole goal, we did not restrict in the bid documents the contractors from changing their categories of work and would permit contractors to alter their selected categories of work after contract execution, provided they genuinely remain above the 35% minimum.  For example, if a contractor first indicates that the building demolition work will be completed with his own forces and then seeks to change it later to subcontractor's work, thereby shifting other work in to its contractor's categories of work, then Thomas would have no objection.

maintains that "Wallace's non-compliant bid gave it the luxury of 'shopping' the *entire* scope of work to various subcontractors and then, after learning which trades could be done cheaper through subcontractors, designate which work it would perform." Again, Harvey makes an incorrect assumption that Wallace was free to subcontract out the entire scope of work. First, nowhere do the bid specifications mandate that the successful bidder would be absolutely bound by the percentage of work it pledged to self-perform. The fact that the bid specifications specifically call for a relaxation of the thirty-five percent provision suggests that the Board and Thomas recognized that circumstances may dictate a necessity for the successful bidder to subcontract some of the work it pledged to self-perform. Second, the bid specifications do not require bidders to submit a list of subcontractors with bids for any of the seven prime contracts. The specifications only require that subcontractors be identified within seventy-two hours of the project architect's request. Thomas made this request after the bid opening on October 11, 2002 and Wallace submitted his subcontractor list on October 14. The same request was made of Harvey, who submitted a letter dated October 14, wherein he stated "we have not decided on our subcontractors at this point." Given Harvey's express language that it had not yet decided on its subcontractors, it is difficult to rationalize the argument that Harvey was "locked in" to the work it stated it would perform. Presumably, Harvey could have "shopped out" six percent of the work it pledged it would self-perform and still have satisfied the thirty-five percent requirement. It cannot be said that the Board waived the thirty-five percent requirement as to Wallace, but not as to Harvey.

Harvey relies on *Prismatic v. Somerset County*, 236 *N.J.Super.* 158, 564 *A.*2d 1208 (App.Div.1989), *certif. denied* 118 *N.J.* 205, 570 *A.*2d 965 (1989), and *Gaglioti Contracting v. Hoboken*, 307 *N.J.Super.* 421, 704 *A.*2d 1301 (App.Div.1997). These cases stand for the premise that failure to name subcontractors in violation of the statutory requirement is a material defect requiring rejection of the nonconforming bid. Harvey does not, however, address the

fact that the bid documents expressly permit the contractors to wait to submit a subcontractor list until seventy-two hours of the architect's request after the bid opening. Therefore, any bidder was free to shop its bid to subcontractors of its choice, as long as it complied with the thirty-five percent requirement. The Board's actions did not, therefore, undermine the competitive bidding process.

### C. *Terrazzo tile work*

As required by Alternate GC–1, Wallace bid $62,400.00 for the Terrazzo work, but valued the same work at $13,000.00 in its original Attachment # 5, which represents base bid work. Harvey states that "there was no Terrazzo work in the base contract." Therefore, Harvey argues that Wallace's conflicting prices for Terrazzo work "call into question not only the amount that Wallace intended to bid for the Alternate Terrazzo work but necessarily the amount of Wallace's total bid for the base contract work." This uncertainty, according to Harvey, gave Wallace the ability to resolve the conflict after bid opening.

Contrary to this argument, the Project plans and specifications state, "Grind down bump @ VCT and terrazzo transition. Cut grooves into existing terrazzo an [sic] install abrasive strips." Thus, Terrazzo was called for in the base bid, as well as in the Alternate GC–1, and Wallace noted a value of $13,000.00 for the base contract work. Therefore, it cannot be said that Wallace's "conflicting" prices call into question the total bid for the base contract work.

### III. Conclusion

Public bidding statutes were not intended to cost public bodies such as the Spring Lake Heights Board of Education many thousands of dollars by requiring acceptance of higher bids for mere technical violations. *See Schlumberger Industries, Inc. v. Borough of Avalon,* 252 *N.J.Super.* 202, 212, 599 *A.*2d 589 (App. Div.1991). The Court is satisfied that Wallace's deficient filing of

Attachment # 5 was an immaterial defect, and as such it was not an abuse of discretion for the Board to afford Wallace the opportunity to cure this deficiency by re-filing a complying Attachment # 5. To disqualify Wallace for what the Court has determined to be an immaterial deficiency would be contrary to the public interest by depriving the taxpayers of Spring Lake Heights of a $192,000.00 savings.

For the aforementioned reasons, the Board's decision to award the General Work contract to Wallace is affirmed, and Harvey's Order to Show Cause is hereby dismissed.